Andrew DANIELS, Appellant,

v.

UNITED STATES, Appellee.

No. 06–CF–265.

District of Columbia Court of Appeals.

Argued Oct. 20, 2009.
Decided Aug. 19, 2010.

Deborah A. Persico presented oral argument, and Joseph Virgilio, appointed by the court, filed a brief, for appellant.

Peter S. Smith, Assistant United States Attorney with whom Jeffrey A. Taylor, United States Attorney at the time the brief was filed, and Roy W. McLeese III, Mary B. McCord, and Ellen Chubin Epstein, Assistant United States Attorneys, were on the brief, for appellee.

James Klein, Alice Wang and Chris Kemmitt, filed a supplemental brief for amicus curiae Public Defender Service, supporting appellant.

Before REID, GLICKMAN and KRAMER, Associate Judges.

REID, Associate Judge:

A jury convicted appellant, Andrew Daniels, of first-degree murder while armed, possession of a firearm during a crime of violence and carrying a pistol without a

license.[1] Mr. Daniels contends that the trial court committed reversible error by (1) admitting hearsay statements during the testimony of two government witnesses; (2) permitting improper prosecutorial comments during the government's rebuttal argument; and (3) convicting him of conduct protected under the Second Amendment to the Constitution.[2] Discerning neither reversible trial court error nor abuse of discretion, we affirm.

## FACTUAL SUMMARY

The record shows that on the night of April 17, 2002, Mr. Daniels fatally wounded Curtis Cofield in the parking lot of the Sursum Corda Apartment complex, located in the Northwest quadrant of the District of Columbia. The apartment complex sits at the top of the hill on the southwest corner of an area known as the Horseshoe, where First Terrace meets L Place. The Golden Rule Apartments, where Mr. Daniels lived, and the Golden Rule Supermarket, are located at the bottom of the hill. On the night of his death, Mr. Cofield was celebrating his birthday with friends and relatives. Around 11:00 p.m., while he was sitting in his car with two friends, Mr. Daniels, who was dressed in black, walked into the lot, stopped about three feet from Mr. Cofield's car and fired shots into the passenger-side window with a silver gun. Mr. Daniels then turned around and left the scene. According to the testimony of Dr. Marie–Lydie Pierre–Louis, then the Chief Medical Examiner for the District of Columbia, Mr. Cofield died of gunshot wounds to his lungs, liver and brain.

To establish Mr. Daniel's guilt, the government called several witnesses who were on the scene at the time of the shooting, or who spoke with Mr. Daniels sometime after the shooting, or who were aware of problems between cohorts of Mr. Daniels and Mr. Cofield. Kenny Kay,[3] who grew

---

1. Respectively, violations of D.C.Code §§ 22–2101, –4502; § 22–4504(b); and § 22–4504(a) (2001). The trial giving rise to this appeal is Mr. Daniels' second—his first resulted in a mistrial due to a hung jury.

2. Mr. Daniels, supported by *amicus curiae* Public Defender Service, argues that his conviction for carrying a pistol without a license ("CPWL") must be vacated as unconstitutional under *District of Columbia v. Heller*, —— U.S. ——, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008). Because he did not raise this contention in the trial court, we review it for plain error. Since *Heller*, "this court has rejected claims that the CPWL statute is unconstitutional on its face." *Riddick v. United States*, 995 A.2d 212, 221–22 (D.C.2010) (citing *Brown v. United States*, 979 A.2d 630, 639 (D.C.2009) ("We are not persuaded that 'no application of the [CPWL] statute could be constitutional' or that the restriction the CPWL statute imposes comes even close to presenting the kind of 'weighty' reason that the Supreme Court has concluded justifies declaring a statute invalid on its face.")) (alteration in original); *Little v. United States*, 989 A.2d 1096 (D.C.2010) (citing *Howerton v.*

*United States*, 964 A.2d 1282, 1288 (D.C.2009) ("It ... is not plain [post-*Heller*], ... either that the particular statutes under which appellant was prosecuted [including the CPWL statute] ... are facially unconstitutional or that these statutes have been invalidated.")) (alteration in original). Furthermore, as we explained in *Sims v. United States*, 963 A.2d 147, 150 (2008), *Howerton, supra*, 964 A.2d at 1288–89, and *Plummer v. United States*, 983 A.2d 323, 335–36 (D.C.2009), it is not obvious that *Heller's* reach extends beyond cases of handgun possession in the home. Because Mr. Daniels' conviction stems from an unjustified shooting in a public parking lot, *Heller* is inapposite to his appeal. Consequently, Mr. Daniels cannot overcome the hurdle of "plain error." *See Riddick, supra*, 995 A.2d at 222 ("In short, the 'facial invalidity' error that appellant asserts is not error at all, much less plain error.")

3. On direct examination, Mr. Kay acknowledged that he had been convicted of a drug offense in 2001, had entered a guilty plea to attempted robbery and assault with a dangerous weapon in 2002, and consequently, he had executed a cooperation agreement with

up in the Sursum Corda complex and who still lived nearby, saw Mr. Daniels in the Horseshoe immediately before and after the shooting. He was standing on the First Terrace side of the Sursum Corda complex and watched as Mr. Cofield and Mr. Daniels "me[ ]t[ ] up." Soon, around "[f]ive to 10 minutes to 15 minutes tops, [he] heard gunshots." After hearing "four or five" shots, he ran towards his home. While Mr. Kay was climbing "the gate"— an eight-foot fence between an alley and L Street—he heard someone say, "move, move, move." Mr. Kay "got down and turned around[,] it was [Mr. Daniels] right there with a gun in his hand." Mr. Daniels put the gun in his pants and climbed over the fence.

During his testimony, Mr. Kay mentioned a person called "Ears," later identified as Daniel Demo; Mr. Demo was one of the men who "hung out" at the top of the hill. When the prosecutor asked about the relationship between Mr. Daniels and Mr. Demo, Mr. Kay replied, "[w]asn't no good, wasn't no good heart"; altercations had taken place between Mr. Daniels and Mr. Demo.[4]

On cross-examination, defense counsel established that in testimony before the grand jury, Mr. Kay said that the gun he saw in Mr. Daniels' hand on the night of the murder was black, even though during his direct examination, he stated the gun

was silver. On redirect examination, he indicated that the gun was silver; he had "seen Mr. Daniels with numerous colors of guns all the time." Before the day on which Mr. Cofield had been killed, Mr. Kay had noticed both a black and a silver gun in Mr. Daniels' possession.

From his home on the First Terrace side of the Horseshoe, Earl Risby,[5] who had lived in the Sursum Corda area his entire life, heard gunshots on the night of Mr. Cofield's death. Mr. Risby looked out of his upstairs bedroom window; Mr. Daniels was in the cut—a footpath between buildings—walking toward First Terrace. Mr. Risby ran downstairs. He opened the front door and saw Mr. Daniels coming through the cut carrying a gun. Quickly, Mr. Risby "shut the door because [he] didn't want to be seen."

Frances Warren lives on the First Terrace side of the Horseshoe, not far from the Sursum Corda Apartments. On the night of his death, Ms. Warren had briefly stopped by the parking lot to wish Mr. Cofield a happy birthday; she had known him all of her life. Later, from her third-story bedroom window, Ms. Warren watched a man dressed in black walk into the apartment parking lot. She heard gunshots and people screaming. Less than a minute later, she saw the same man walking in the opposite direction.

Laura Pearson,[6] a ten-year resident of the Sursum Corda area, was in the Horse-

---

the government pertaining to Mr. Daniel's case.

4. The prosecutor wanted to elicit through Mr. Kay that Mr. Demo told him that Mr. Daniels had robbed Mr. Demo. After hearing Mr. Kay's testimony regarding the alleged robbery without the presence of the jury, the trial judge disallowed the inquiry in the presence of the jury. As the judge put it: "It's just too uncertain about whether it was direct, circumstantial, ... hearsay or otherwise. Just not enough [of] an indicia of reliability even as hearsay. I'll ask you not to do it."

5. Mr. Risby admitted that, consistent with his plea agreement with the government, he entered a guilty plea to the charge of conspiracy to distribute cocaine; the charge resulted from his December 2004 arrest. He also agreed that since October 22, 2004, he had been paid as an agent for the government, but none of the payments related to Mr. Daniel's case.

6. Ms. Pearson was a reluctant witness who did not wish to be in court. She was convicted of possession of marijuana and a Bail Reform Act violation in 2001, and unlawful

shoe on the night of the murder. A man dressed in black, walked by her in the direction of the parking lot. Ms. Pearson heard gunshots; moments later, the man returned with a black gun in his hand. Sometime later, in July 2002, Detective Gregory Sullivan of the Metropolitan Police Department, the lead detective for the investigation of Mr. Cofield's murder, showed Ms. Pearson nine photographs. From this photo spread, Ms. Pearson selected the picture of Mr. Daniels as the person she saw on the night of the murder.

Danny Winston,[7] a fifteen-year resident of Sursum Corda who frequented the top of the hill in the Horseshoe area, was among those celebrating Mr. Cofield's birthday. He described Mr. Daniels as a friend. "When it started drizzling," Mr. Winston walked out of the parking lot. He saw Mr. Daniels "walking up." Mr. Daniels stopped "three feet from [Mr. Cofield's] car[,] [p]ulled out a gun and shot him, shot towards the car. Hit [Mr. Cofield]. Turned back around and walk[ed] off."

The government attempted to establish the motive for the murder of Mr. Cofield through at least three witnesses—Mr. Risby, Antwan Harrington, and Sandra Whitley. Mr. Risby knew both Mr. Cofield and Mr. Daniels from the neighborhood. Mr. Cofield and his friends (including Mr. Demo) would gather at the Horseshoe while Mr. Daniels and his friends (including Mr. Winston) would "hang out" near the Golden Rule Supermarket. On one occasion, Mr. Demo told Mr. Risby that Mr. Daniels "robbed him." In return, Mr. Demo and his friends "sho[ ]t at" Mr. Dan-

iels and his friends. Mr. Risby responded "[y]es" to the prosecutor's question as to whether "the robbery and the shooting [ ] was ... part of an ongoing beef between [Mr. Daniels] and his friends [who hung out] at the bottom of the hill," and Mr. Demo and Mr. Cofield and their friends who gathered "at the top of the hill." Mr. Demo was killed between May 24 and 26, 2002, and the alleged robbery occurred "six to eight months before Mr. [Demo] was killed."

On the morning of Mr. Cofield's birthday, Mr. Harrington,[8] a ten-year resident of Sursum Corda, witnessed Mr. Daniels and Mr. Cofield (both of whom he knew) in the Horseshoe arguing "about the money [Mr. Daniels] took from ... [Mr. Demo]." Mr. Cofield declared: "There's going to be some trouble if [Mr. Daniels] didn't give [Mr. Demo] his money back." Mr. Daniels retorted that "he could return the same favor."

Ms. Whitley, the godmother of Mr. Daniels' sister, had lived in the Golden Rule Apartments at the bottom of the hill for ten years. Around 3:00 in the afternoon on the day of the shooting, Mr. Daniels picked up his daughter from Ms. Whitley's apartment. In the grand jury and at Mr. Daniels' first trial, Ms. Whitley testified that during this visit Mr. Daniels had told her, "I'm going to bust somebody up on the hill." The next day, Ms. Whitley "heard somebody got shot" up the hill. About a week later she learned the "somebody" was Mr. Cofield. At Mr. Daniels' second trial, Ms Whitley's testimony changed. She testified that Mr. Daniels

entry and another Bail Reform Act violation in March 2005.

7. At the time of his testimony Mr. Winston was serving a prison sentence for second-degree murder.

8. During his testimony, Mr. Harrington stated that he was incarcerated because he had pled guilty in the District of Columbia to unlawful distribution of cocaine. He also had a prior Virginia felony conviction for credit card theft.

said, "I'm going up on the hill. I'm going to bust a game." "Mr. Daniels gambled a lot," she voluntarily added. Ms. Whitley also claimed that she did not learn anything about the shooting until "about two or three weeks later because [she] hadn't been around the neighborhood." Because Ms. Whitley was impeached with her prior testimony, the jury heard both versions of her story.[9] Detective Sullivan testified that he had "spoke[n] to [Ms.] Whitley a couple [of] times with regard to the investigation." She "told [him] that she had been in [Mr.] Daniel's presence in her apartment and that [Mr.] Daniels told her that he was going to go up the hill and bust somebody."

While incarcerated at the District of Columbia Jail, Mr. Daniels spoke about the murder with two fellow inmates: Richard Williams and Melvin Widery. Prior to his first trial, Mr. Daniels told Mr. Williams: "[Mr. Cofield] tried to get in my water, so I drowned him." More specifically, "[Mr. Daniels] said that he walked up, he walked up on [Mr. Cofield]. It was [Mr. Cofield's] birthday. He ain't even say if it was a gun or anything, just said he punished [Mr. Cofield]." Mr. Widery and Mr. Daniels met between Mr. Daniels' first and second trials. Mr. Daniels told Mr. Widery that "when he bust off," Mr. Cofield "was in the passenger seat of his truck." The two men also discussed witnesses from Mr.

Daniels' first trial. In Mr. Daniels' estimation, Ms. Warren's sighting of him from her third-floor window "was impossible because I was dressed all in black." Mr. Daniels further relayed that "his youngest sister['s] godmother" was planning to testify in the second trial that when Mr. Daniels said "bust somebody," "she thought [Mr. Daniels] might have been talking about going gambling with someone." [10]

## ANALYSIS

### Alleged Evidentiary Errors By the Trial Court

■ Mr. Daniels first complains that the trial court erred by allowing Mr. Risby to provide hearsay testimony which implicated him (Mr. Daniels) in the robbery of Mr. Demo. The factual context for this argument is as follows. On direct examination, the prosecutor asked Mr. Risby, "Now are you familiar about an incident that took place between [Mr. Daniels] and [Mr. Demo]?" Mr. Risby replied, "Yes," and explained, "Well, [Mr. Demo] came running back up the street one day and told us that [Mr. Daniels] robbed him." Mr. Risby could not recall the exact date, but estimated "it was like almost six or eight months before [Mr. Demo was] killed" in May 2002. The prosecutor inquired as to anything "that [Mr. Demo] and his friends might have done in retaliation." Based on what Mr. Demo had told him, Mr. Risby

9. The first version of the statement Ms. Whitley attributed to Mr. Daniels, "I'm going to bust somebody up on the hill," was admissible as non-hearsay substantive evidence under D.C.Code § 14–102(b), which provides, in part: "A statement is not hearsay if the declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement and the statement is (1) inconsistent with the declarant's testimony, and was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition.... Such prior statements are substantive evidence."

10. Mr. Daniels did not testify, but he presented two witnesses. A staff member at the District of Columbia Jail testified that Mr. Daniels was in jail between August 2001 and February 24, 2002, thus implying that Mr. Risby was not a credible witness since he claimed that Mr. Daniels had robbed Mr. Demo around late Fall 2001. A Metropolitan Police Department officer testified that his sketch of the crime scene did not reflect distances.

responded: "They went down the street to shoot at them guys." At the prosecutor's request, Mr. Risby elaborated:

Well, when [Mr. Demo]—the day he was robbed, he came to the house where they were staying at, and he was mad because he said [Mr. Daniels] robbed him. And he was all like—he was telling [someone] he was ready to go shoot at them. And three or four days later when they shot at him, they ran back to the house, because they said the police was coming. That's how I know that.

The prosecutor then asked: "Was this— the robbery and the shooting, was this part of an ongoing beef between [Mr. Daniels] and his friends, the folks at the bottom of the hill, and ... [Mr. Demo], [Mr. Cofield], the folks at the top of the hill?" "Yes," Mr. Risby replied.

Defense counsel opened her examination of Mr. Risby by asking whether he was "currently an agent for the government."[11] Mr. Risby answered affirmatively. Counsel then posed three questions about the robbery of Mr. Demo; each related solely to the time frame. The other two dozen transcript pages of cross-examination involve a significant and thorough impeachment of Mr. Risby. Defense counsel questioned why Mr. Risby had not come forward until he was arrested under a federal charge of conspiracy to distribute crack cocaine. She also emphasized Mr. Risby's prior convictions and highlighted both his plea agreement and his hope for the government's assistance in securing a lenient sentence. Further, defense counsel inquired into Mr. Risby's status as a paid informant and pointed out that, as an informant, Mr. Risby "essentially engage[d] in deceiving people." On redirect, the prosecutor did not mention

the robbery of Mr. Demo but instead focused on: the reason why Mr. Risby did not come forward sooner; the money he received as an informant; his possible sentence reduction; his role in the charged drug conspiracy; and what he saw on the night of Mr. Cofield's murder.

On this record, we need not determine whether the admission of Mr. Risby's challenged testimony constituted trial court error, because we are satisfied that, assuming error, it was harmless. *See Wilson v. United States,* 995 A.2d 174, 188 (D.C. 2010) ("Assuming without deciding that the prosecutor's question to the detective elicited hearsay and that allowing the detective's answer was error, we can say with fair assurance that the (assumed) error was harmless."); *In re D.B.,* 947 A.2d 443, 453 (D.C.2008) (" 'We need not determine whether the court erred' by considering the [contested admission] for a substantive purpose, because appellant 'was not sufficiently prejudiced by [any] error to justify reversal.' " (quoting *Sanders v. United States,* 809 A.2d 584, 591 (D.C. 2002))) (second alteration in original); *Anderson v. United States,* 857 A.2d 451, 463 (D.C.2004) ("[a]ssuming, without deciding, that the [contested admission] was an abuse of discretion, the error was nonetheless harmless").

Mr. Daniels claims that any error in admitting the challenged testimony was not harmless. To illustrate, he compares the outcome of his first trial—where Mr. Risby did not testify and a hung jury resulted in a mistrial—with the outcome of his second—where Mr. Risby testified and the jury pronounced him guilty. Mr. Daniels maintains that Mr. Risby provided the only evidence supporting the government's

11. Mr. Risby was a paid informant for the Drug Enforcement Agency and the Metropolitan Police Department.

theory of a feud as motive for the shooting and therefore posits that Mr. Risby's testimony accounts for the different outcomes. The government rejoins that witnesses other than Mr. Risby provided motive testimony and highlights Mr. Harrington's account of the threats exchanged between Mr. Cofield and Mr. Daniels on the morning of the murder. The government also calls attention to the evidence against Mr. Daniels, including: the eye-witness testimony of the shooting; the corroborating testimony of witnesses who saw Mr. Daniels with a gun before and after the incident; and Mr. Daniels' fluctuating alibis.[12] This evidence of guilt, the government insists, rendered harmless any possible error committed by admitting Mr. Risby's motive testimony. We believe the government has the better argument.

The record clearly refutes Mr. Daniels' contention that Mr. Risby's testimony regarding the robbery and retaliation was the only evidence presented in furtherance of the government's theory of an ongoing feud as motive for the shooting. On the morning of the murder, Mr. Harrington witnessed Mr. Daniels and Mr. Cofield exchange threats as they argued about money that Mr. Daniels "took from [Mr. Demo]." Along with his eye-witness account of the shooting, Mr. Winston told the jury that Mr. Cofield was "[a] guy that ['hung out'] up top" and that, he generally did not hang out with Mr. Daniels "[u]nless [he went] down to the market ... [to] chill down there." Ms. Warren stated that Mr. Daniels hung out "down the bottom." The prosecutor asked her: "And in your experience, is there ever any animosity between, or arguments between the people at the top of the hill and the people at the bottom of the hill?" "I mean, yes," she answered. Mr. Kay testified that Mr. Co-

field and Mr. Demo were "good friends" and that they hung out at the top of hill. Mr. Kay also stated that Mr. Daniels hung out at the bottom of the hill and that the relationship between Mr. Daniels and Mr. Demo "wasn't so good, wasn't no good heart." Consequently, and contrary to Mr. Daniels' contention, Mr. Risby's testimony about the robbery and retaliation certainly was not "the only evidence of the government's [motive] theory."

Furthermore, we conclude that Mr. Daniels was not sufficiently prejudiced by the admission of Mr. Risby's challenged testimony to justify reversal of his conviction. *In re D.B., supra,* 947 A.2d at 453. First, defense counsel seriously called into question Mr. Risby's credibility on cross-examination. Second, the evidence against Mr. Daniels was strong and compelling. Mr. Harrington watched Mr. Daniels and Mr. Cofield threaten one another on the morning of the murder. That afternoon, Mr. Daniels told Ms. Whitley that he was "going up the hill to bust somebody." Several witnesses testified that Mr. Daniels was armed and in the immediate area both before and after the shooting. Indeed, Mr. Winston saw Mr. Daniels fire the fatal shots into Mr. Cofield's vehicle. Mr. Williams and Mr. Widery told the jury about Mr. Daniels' post-incarceration confessions and commentary. While Mr. Daniels correctly points out that Mr. Risby testified in the second trial but not the first, the same can be said for Mr. Harrington, Mr. Williams, and Mr. Widery. The differing verdicts therefore could be attributed to unchallenged testimony from any, or all, of four new witnesses. *See, e.g., Rowland v. United States,* 840 A.2d 664, 676, 687–88 (D.C.2004) (refusing to speculate on reasons why the first trial resulted in a hung jury where "the prose-

**12.** Detective Sullivan testified that Mr. Daniels more than once changed his alibi upon being informed it either could not be verified or could be refuted.

cution evidence was strong and the case was not a close one"). In short, assuming—without deciding—that the admission of Mr. Risby's testimony about the robbery and retaliation constituted error, we can say, " 'with fair assurance,' " that the jury's guilty verdict " 'was not substantially swayed by the [assumed] error.' " *In re D.B., supra,* 947 A.2d at 453 (quoting *Kotteakos v. United States,* 328 U.S. 750, 764–65, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)).[13]

■ Mr. Daniels' second complaint concerning trial court evidentiary error relates to Mr. Kay's testimony that Mr. Kay had seen Mr. Daniels with "numerous guns." Mr. Daniels insists that the trial court erroneously admitted this testimony because Mr. Kay's "numerous guns" comment "had no relevance whatsoever" and "did nothing more than show that he had criminal propensity." The factual context for this argument resides in Mr. Kay's testimony. Mr. Kay stated that he saw Mr. Daniels in the Horseshoe on the night of the shooting, both before and after the incident. Following the gunshots, Mr. Kay was "climbing the gate"—an eight-foot fence erected between an alley and L Street—when he "heard someone say move, move, move." Upon hearing this command, Mr. Kay told the jury:

I got down and turned around it was [Mr. Daniels] right there with a gun in his hand. He put the gun up [i.e., put it in his pants] [*id.* at 124]. He climbed the gate, then I climbed the gate. Then I went home. And wherever he went I don't know after that.

In response to the prosecutor's question about the type of gun, Mr. Kay replied, "I'm not really too tight with all the guns like that but it was a silver gun." Defense counsel then proceeded to impeach Mr. Kay, in part, by contrasting his direct testimony at trial that he saw a silver gun with his grand jury testimony that he saw a black gun. Mr. Kay acknowledged that his testimony before the grand jury was different, but he stated: "I [saw] Mr. Daniels with numerous guns, black." Defense counsel made a motion to strike Mr. Kay's response, but the trial court denied the motion, and instructed Mr. Kay to "complete [his] answer." Defense counsel then said: "You were asked what gun you saw—you didn't say I saw him with numerous guns in the grand jury, did you?" Mr. Kay answered: "No, I didn't."

Defense counsel emphasized the fact that Mr. Kay had told the grand jury that the shooting had occurred in July. And, defense counsel questioned Mr. Kay regarding his hope for a reduced sentence in exchange for testifying in the instant case and other cases. After the government elicited testimony, on redirect examination,

13. We are not persuaded by Mr. Daniels' argument that the trial court erred by failing to grant him a continuance. Most notably, this argument lacks any support in the record, which shows the following:

Two days prior to trial, the trial court convened for jury selection. As a preliminary matter, defense counsel pushed for immediate resolution of an issue regarding Mr. Risby's testimony. Counsel declared: "Your Honor, if the [c]ourt is going to let it in, if the [g]overnment intends to use it and if the [c]ourt is going to let it in, we are entitled to a continuance." The record unequivocally reveals that "it" was "new information" to which Mr. Risby could testify—specifically, after Mr. Demo's retaliatory shooting, "Andrew Daniels came to the up hill or top of the hill portion of Sursum Corda on at least one occasion firing shots." The judge ruled, "I am not going to hear the issue about additional other crimes evidence now before we empanel the jury."

Later that morning, the judge heard arguments and told defense counsel, "I think that you have carried the day in this respect. . . . It is too late for you to be expected to counter this information." Accordingly, because the trial court did not "let it in," defense counsel's request for a continuance became moot.

to explain the apparent contradictions in Mr. Kay's testimony, defense counsel asked for, and was given, an opportunity to re-cross Mr. Kay. She questioned Mr. Kay about his testimony from Mr. Daniel's first trial:

> Defense: All right. And you were asked the following question and you gave the following answer.
>
> "Do you know why you said black then and silver now?" Your answer was, "[N]o sir." That's what you testified to then, correct?
>
> Mr. Kay: Can I see that please?
>
> Defense: Certainly.... Again this is testimony from a—sworn testimony from a proceeding September 15, 2003, correct?
>
> Mr. Kay: Correct.
>
> Defense: And this is a transcription of your sworn testimony from that day, correct?
>
> Mr. Kay: Correct.
>
> Defense: Directing your attention to page 223 lines 8 through 10. That's the question and answer you gave then, correct?
>
> Mr. Kay: Yes.

(quotation marks added).

We turn now to the applicable legal principles. "Relevant evidence is simply that which tends to make the existence or nonexistence of a [contested] fact more or less probable than it would be without the evidence." *Busey v. United States,* 747 A.2d 1153, 1165 (D.C.2000) (quotation marks and citations omitted; alteration in original). The general rule governing "other crimes" is:

> [E]vidence of a crime for which the accused is not on trial is "inadmissible to prove disposition to commit crime, from which the jury may infer that the defendant committed the crime charged. Since the likelihood that juries will make

such an improper inference is high, courts presume prejudice and exclude evidence of 'other crimes' unless that evidence can be admitted for some substantial, legitimate purpose."

*Id.* at 1164 (quoting *Drew v. United States,* 118 U.S.App.D.C. 11, 15–16, 331 F.2d 85, 89–90 (D.C.Cir.1964)). The rules for so-called *Drew* evidence may be inapplicable "where the 'other crime' is not independent of and unrelated to the charged crime." *Id.* at 1165. " 'Specifically, *Drew* does not apply where such evidence (1) is direct and substantial proof of the charged crime, (2) is closely intertwined with the evidence of the charged crime, or (3) is necessary to place the charged crime in an understandable context.' " *Id.* at 1165 (quoting *Johnson v. United States,* 683 A.2d 1087, 1098 (D.C.1996)). "[O]ne requirement that applies to the admission of all evidence of 'other crimes,' *Drew* and *non-Drew* alike, is that relevance, or probative value, must be weighed against the danger of unfair prejudice." *Busey, supra,* 747 A.2d at 1165. As such, " 'evidence otherwise relevant may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice it poses.' " *Id.* (quoting *Johnson, supra,* 683 A.2d at 1101). Administration of this balancing test lies within the discretion of the trial court; we review "only for abuse of that discretion." *Id.; Johnson, supra,* 683 A.2d at 1095.

Our decisions in *Busey v. United States* and *Lewis v. United States* are instructive for our review of Mr. Daniels' complaint about Mr. Kay's testimony. In *Busey,* "[i]n accordance with the judge's pretrial ruling, the government elicited from [its witness] on direct examination that she had seen Busey with a gun two days before [the victim] was murdered but did not bring out the circumstances"—Busey had assaulted the witness. 747 A.2d at 1164.

"On cross examination, however, Busey's defense counsel challenged [the witness'] credibility by eliciting that she could not remember the time of day she first saw Busey with the gun, which floor of the building she was on, how long she had been there, or what she had been doing that day." *Id.* On redirect, the judge permitted the government to question the witness "about the circumstances under which she had seen Busey with a gun, i.e., the assault." *Id.* We concluded that the trial judge "exercised his discretion soundly." *Id.* at 1166.

*Lewis* involved a plain-error review of the trial judge's failure to *sua sponte* take corrective action when, on cross examination, the complainant remarked on another person's statement identifying the defendant. 930 A.2d 1003, 1010 (D.C.2007). In affirming, we made two observations pertinent to the instant case.

In the first place, this "error" was created entirely by the defense; the testimony about the [other person's] statement was elicited and developed by defense counsel during his cross examination of [the complainant], and was mentioned only by defense counsel during closing argument. "Thus the error that occurred, if any, was invited by defense counsel.... It is well established that a defendant 'cannot well complain of being prejudiced by a situation which [he] created.'" *Parker v. United States,* 757 A.2d 1280, 1286–87 (D.C.2000) (citations omitted).

. . . .

Finally, appellant has not shown that the admission of [the other person's] out-of-court identification, even if it was error, was prejudicial to his defense. Defense counsel made full, intentional use of the statement in an attempt to discredit [the complainant], and [the other person's] additional identification of appellant was merely cumulative of the identifications by [the complainant] and [another witness].

*Id.* at 1010–11 (first ellipsis and third alteration in original); *see Gonzalez v. United States,* 697 A.2d 819, 826 (D.C.1997) ("The testimony that [the appellant] characterizes as being 'highly prejudicial' was elicited not by the prosecutor but by defense counsel during his cross examination of the expert witness. Thus the error that occurred, if any, was invited by defense counsel."); *cf. Mungo v. United States,* 987 A.2d 1145, 1155 (D.C.2010) (rejecting claim of prejudice where defense counsel did not "question[ ] the reliability" of the challenged evidence but rather "sought to use [it] to defense advantage").

Here, defense counsel challenged the credibility of Mr. Kay by calling into question his contradictory descriptions of the gun and, albeit unintentionally, counsel elicited the "numerous guns" comment. Although this comment was non-responsive to the query posed, Mr. Daniel's defense counsel "made full, intentional use of the statement in an attempt to discredit [Mr. Kay]." *Lewis, supra,* 930 A.2d at 1011. Counsel's attack occurred not only on cross-examination, but also during closing argument:

Just one more thing with regard to Kenny Kay's testimony before you. He said that the gun was silver here before you.... When he testified at the grand jury, he said that the gun was black. And then when asked by the government why did you say it was silver then when you said it was black now. Because I seen him with guns all the time. And he admitted that at this previous proceeding when he was asked that question he said I don't know.

Now, why did he do that because ... he figured he would make it a little bit better this time around. He would

make it just a little bit stronger so that he could get that 5K1 motion, make it a little bit stronger. He has got five people he's in the running with just in this case.

■ Moreover, Mr. Kay's testimony that he had seen Mr. Daniels with guns on previous occasions—particularly a gun "that might have been the murder weapon"—was not admitted to establish criminal propensity; "[t]hat evidence was directly relevant, and was not *Drew* evidence, because it constituted evidence supporting the charge that [Mr. Daniels] was the person who ... murdered [Mr. Cofield]." *Busey, supra,* 747 A.2d at 1165. " 'An accused person's prior possession of the physical means of committing the crime is some evidence of the probability of his guilt, and is therefore admissible.' " *Id.* (quoting *(Earl) Coleman v. United States,* 379 A.2d 710, 712 (D.C.1977)) (citations omitted); *see also Thomas v. United States,* 978 A.2d 1211, 1240 (D.C.2009) (concluding "the prior sworn testimony" that the witness saw the appellant "with a firearm four days after the murder" was "admissible as substantive evidence" and "relevant because it showed [the appellant's] possession of what reasonably could have been the murder weapon soon after the shooting"). Although this "evidence established only a reasonable probability, and not a certainty, that [Mr. Daniels] possessed the murder weapon," the connection between Mr. Kay's comment and the murder "was not 'conjectural and remote,' and so the lack of certainty goes to the weight of the evidence, not its admissibility." *Busey, supra,* 747 A.2d at 1165 (citations omitted).

Mr. Kay was not the only person who had seen Mr. Daniels with guns prior to Mr. Cofield's murder. Mr. Winston also testified that he had "many times" seen Mr. Daniels with a silver gun. And, Mr. Kay's "numerous guns" comment was not referenced by the government during its closing argument. In essence, Mr. Daniels created and then took full advantage of the "error" about he which now complains. *See Lewis, supra,* 930 A.2d at 1010–11. Since Mr. Kay's testimony was relevant and probative, and its "probative value [was not] substantially outweighed by the danger of unfair prejudice," *Busey, supra,* 747 A.2d at 1165 (citation and internal quotation marks omitted), we are convinced that the trial court did not abuse its discretion by refusing to strike the challenged testimony.

### The Prosecutor's Rebuttal Arguments

■ Mr. Daniels takes issue with prosecutorial comments that he has extracted from the government's rebuttal argument. In Mr. Daniels' estimation, the trial court committed reversible error by not *sua sponte* intervening when "the prosecutor inflamed the passions of the jury, violated [his] right to be presumed innocent, vouched for the credibility of government witnesses and argued facts not in evidence by commenting on a witness' allegedly prior consistent testimony." [14]

14. To support his argument that the prosecutor inflamed the jury's passions, Mr. Daniels lifts up comments about "crime going on out there in society," with people "robbing," "raping," and "murdering" others. As an example of the prosecutor's violation of Mr. Daniel's right to be presumed innocent, Mr. Daniel's cites the following statement: "Thank goodness we have a criminal justice system where you are going to [be] presume[d] innocent because that detective sure didn't presume innocen[ce].... [M]aybe he didn't because he had information that he wasn't innocent." With regard to improper vouching, Mr. Daniels focuses on the prosecutor's comments about a detective and asked whether "he would risk his badge and job," and ended by saying, "He didn't lie." Coun-

■ Generally, "comments appealing to the emotions, prejudices and passions of the jury," or comments "arguing facts not in evidence or misstating facts in evidence," are improper. *Diaz v. United States,* 716 A.2d 173, 180 (D.C.1998) (citations and internal quotation marks omitted). "The propriety and import of the prosecutor's remarks ... must be viewed in perspective by examining the arguments advanced by the defense, for a prosecutor may respond, in rebuttal, to defense counsel's assertions." *(Ronald) Coleman v. United States,* 515 A.2d 439, 450 (D.C. 1986) (citations omitted). "Closing arguments, and especially rebuttal arguments, are 'seldom carefully constructed *in toto* before the event; improvisation often frequently results in imperfect syntax and planning.'" *Lee v. United States,* 668 A.2d 822, 831 (D.C.1995) (quoting *Donnelly v. DeChristoforo,* 416 U.S. 637, 646–47, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)) (citation omitted).

■ If the prosecutor's comments are improper and an objection has been made, we examine whether they " 'rise to the level of substantial prejudice.' " *Hartridge v. United States,* 896 A.2d 198, 221 (D.C.2006) (quoting *United States v. Moore,* 322 U.S.App.D.C. 334, 347, 104 F.3d 377, 390 (1997)). "This determination involves an examination of the gravity of the improper comments, the corrective action taken by the trial judge, and the strength of the government's case." *Id.* We look for "legal error or abuse of discretion by the trial judge, not by counsel." *Irick v. United States,* 565 A.2d 26, 33 (D.C.1989) (citations omitted). However,

where counsel fails to object to the challenged comments, as here with the exception of one instance, our review is for plain error. *See United States v. Olano,* 507 U.S. 725, 732, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) (The plain error standard requires a showing of " 'error' that is 'plain' and that 'affects substantial rights.' " If these conditions are satisfied, then appellant must demonstrate that the error "seriously affects the fairness, integrity, or public reputation of [the] judicial proceeding[ ]."). *See also Thomas v. United States,* 914 A.2d 1, 21–24 (D.C.2006).

Some of the comments regarding the presumption of innocence and vouching for the credibility of a detective either are close to the edge of propriety, or cross the line into impropriety. Indeed, the government "acknowledge[s]" that one aspect of the prosecutor's rebuttal relating to vouching was improper. That is, in discussing a detective's testimony, the prosecutor asked the jury: "Why would Detective Sullivan want to arrest the wrong person? What's his motivation to arrest [Mr.] Daniels and let the real killer go?" However, Mr. Daniels cannot demonstrate that these comments about Detective Sullivan (or others to which there was no objection) seriously affected his substantial rights, or seriously affected the fairness, integrity or public reputation of the proceeding against him, or substantially prejudiced him. *See Olano, supra,* 507 U.S. at 732, 113 S.Ct. 1770; *see also Teoume–Lessane v. United States,* 931 A.2d 478, 495 (D.C.2007) ("[R]eversal for plain error in cases of alleged [improper prosecutorial comments] should be con-

---

sel did not object to these comments. However, defense counsel objected to what Mr. Daniels identifies as comments on evidence not admitted at trial. These comments related to "the rumor floating around [Sursum Corda] ... that [Mr.] Daniels killed [Mr.] Cofield." The prosecutor stated that "people

like [Ms. Pearson] ... could have heard [the rumor] on the street." The prosecutor added: "But these aren't people who are just reciting back a rumor. They're going under oath in the grand jury. They're going under oath here at trial."

fined to particularly egregious situations") (internal quotation marks and citations omitted) (first alteration in original).

 Finally, we see no need to determine, definitively, whether the prosecutor's comments relating to facts not in evidence were improper because we are satisfied that they do not "rise to the level of substantial prejudice" to Mr. Daniels. Upon hearing defense counsel's objection to the comment pertaining to the rumor that Mr. Daniels killed Mr. Cofield and the reference to grand jury testimony, the trial judge offered to give the jury a curative instruction even though he did not believe there was anything improper about the argument, but defense counsel was not satisfied with the proposed instruction. When the trial court tried to determine whether there was "something about the way [he] instruct[ed]," defense counsel replied: "No, Your Honor, I just would like it not be given." Nevertheless, the trial court three times instructed the jury that the attorneys' arguments are not evidence, and "we must presume that a jury follows the court's instructions, absent any indication to the contrary." *Lewis, supra,* 930 A.2d at 1008. Under these circumstances, and given the strength of the government's case against Mr. Daniels, we are persuaded that any error did not substantially prejudice Mr. Daniels. *See Teoume–Lessane, supra,* 931 A.2d at 495 (We can say, "with fair assurance, after pondering all that happened without stripping [any] erroneous action from the whole, that the judgment was not substantially swayed by [any] error.") (internal quotation marks and citation omitted).

Accordingly, for the foregoing reasons, we affirm the judgment of the trial court.

*So ordered.*