*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 12-CF-825, 12-CF-1007

CURTIS L. MCKNIGHT and ROBERT H. PUMPHREY, APPELLANTS,

v.

UNITED STATES, APPELLEE.

Appeals from the Superior Court of the
District of Columbia
(CF1-25075-07, CF1-22254-08)

(Hon. William M. Jackson, Trial Judge)

(Argued May 20, 2014                    Decided October 30, 2014)

*Craig N. Moore* for appellant Curtis L. McKnight.

*Julian S. Greenspun* for appellant Robert H. Pumphrey.

*Peter S. Smith*, Assistant United States Attorney, with whom *Ronald C. Machen*, *Jr.*, United States Attorney, *Elizabeth Trosman*, *Alessio D. Evangelista*, and *Lara Worm*, Assistant United States Attorneys, were on the brief, for appellee.

Before GLICKMAN and EASTERLY, *Associate Judges*, and PRYOR, *Senior Judge*.

Opinion for the court by *Associate Judge* EASTERLY.

Opinion dissenting in part by *Senior Judge* PRYOR at page 18.

EASTERLY, *Associate Judge*:  Curtis L. McKnight and Robert H. Pumphrey were jointly tried in connection with the shooting death of Raynard Jennings.  Mr. McKnight, the gunman, was convicted of first-degree murder while armed, possession of a firearm during the commission of a crime of violence (PFCV), unlawful possession of a firearm by a convicted felon, and obstruction of justice.[1]  Mr. Pumphrey, who had handed Mr. McKnight the gun used in the shooting, was convicted of second-degree murder while armed under an aiding and abetting theory, PFCV, and unlawful possession of a firearm by a convicted felon.[2]  Both appellants now challenge their convictions on various grounds.  We determine that only one has merit:  Mr. Pumphrey's insufficiency challenge to his conviction for second-degree murder.  Because there was insufficient evidence to support a jury's determination beyond a reasonable doubt that Mr. Pumphrey possessed the requisite malicious intent, we reverse Mr. Pumphrey's convictions for second-degree murder and PFCV.  We otherwise affirm.

---

[1]  D.C. Code §§ 22-2101, -4502, -4504 (b), -4503 (a)(2), -722 (a)(3) (2012 Repl.).

[2]  D.C. Code §§ 22-2103, -4502, -4504 (b), -4503 (a)(2) (2012 Repl.).

## I.      Facts and Procedural History

The government's case against Mr. McKnight and Mr. Pumphrey rested on the testimony of one eyewitness to the shooting, Shanicka Adams. Ms. Adams had been in her bedroom watching television when, around two o'clock in the morning, she heard "arguing" outside. She went to the window and saw three men in the street: Mr. McKnight and Mr. Pumphrey, whom she knew from the neighborhood, and a man, later identified as Mr. Jennings, whom she did not know.[3]

Ms. Adams testified that Mr. McKnight and Mr. Pumphrey were both standing by Mr. Pumphrey's car. Mr. Jennings was sitting in a different car, parked in front of Mr. Pumphrey's car. Mr. McKnight and Mr. Jennings were arguing. Because Ms. Adams could not hear what the men were saying, she went into her sister's room where the window was open. Looking out from her new vantage point, she saw the two men, still arguing. She then observed Mr. Jennings get out of his car and open his trunk. As Ms. Adams described it, he was "going through everything," and "throwing stuff out as if he was looking for something."

---

[3] Ms. Adams also saw Tasha White, another neighborhood acquaintance, standing by her own vehicle, and another man sitting in Mr. Pumphrey's car.

Ms. Adams watched as Mr. McKnight followed Mr. Jennings to the trunk, and then asked what Mr. Jennings was looking for. Mr. Pumphrey remained by his car. As Mr. Jennings continued to rummage through his trunk, Ms. Adams heard Mr. Pumphrey say: "[H]e's looking for something, he's looking for something." Mr. Pumphrey then walked to the passenger side of his car, reached through the window, and retrieved a gun.[4] Ms. Adams saw Mr. Pumphrey hand the gun to Mr. McKnight and return to the driver's side of his car.

According to Ms. Adams, when Mr. Jennings saw Mr. McKnight with a gun, Mr. Jennings turned and began to run away. At that point, Mr. McKnight started shooting. Ms. Adams testified that she saw Mr. McKnight fire three shots and then she ducked down below the window. She testified that she heard a few more shots and then returned to her bedroom; she did not look out the window again.

---

[4] Ms. Adams testified that she had seen Mr. McKnight and Mr. Pumphrey with the gun before, and that she had seen Mr. McKnight carrying it in the waistband of his pants the day before the shooting. But at trial Ms. Adams was only able to give the most minimal description of the gun ("black," "long handle"), which was somewhat different from the description she had given the police. She told the police that the gun was black and "small"; "[t]he handle was small and shiny."

Notwithstanding this testimony, and without any explanation of how she could have seen subsequent events, Ms. Adams also testified that she saw what happened after the shooting. She said she saw Mr. McKnight walk over to Mr. Jennings's trunk and look inside, and she saw Mr. McKnight and Mr. Pumphrey get into Mr. Pumphrey's car (Mr. Pumphrey as the driver) and leave the scene.[5]

This was the entirety of Ms. Adams's testimony. And although the government called a number of witnesses to testify in its case in chief, none of them provided any other direct evidence regarding Mr. McKnight and Mr. Pumphrey's involvement in the shooting death of Mr. Jennings.

At the conclusion of the trial, a jury found both men guilty of murder—Mr. McKnight of first-degree murder while armed, and Mr. Pumphrey of the lesser included charge of second-degree murder while armed, under an aiding and abetting theory. This appeal followed.

---

[5] Ms. Adams testified that she also saw Ms. White drive away in her car, going in the same direction as Mr. McKnight and Mr. Pumphrey.

## II.    Argument

### A.  Mr. Pumphrey's Appeal

Mr. Pumphrey argues that the evidence at trial was insufficient to support his conviction, under an aiding-and-abetting theory, for second-degree murder while armed (and relatedly possession of a firearm during the commission of this crime of violence).  Specifically, Mr. Pumphrey contends that he lacked the requisite intent for second-degree murder as required by *Wilson–Bey v. United States*, 903 A.2d 818, 822 (D.C. 2006) (holding that an aider and abettor must have the intent required of the principal offender).

When presented with a claim of insufficiency, we must review the evidence "in the light most favorable to the government, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact." *Coleman v. United States*, 948 A.2d 534, 550 (D.C. 2008) (quoting *Freeman v. United States*, 912 A.2d 1213, 1218 (D.C. 2006)).  We may only reverse if we determine that, based on the evidence presented by the government, no reasonable juror could have fairly concluded that the defendant was guilty of the crime charged beyond a reasonable doubt. *Id.*  Applying this standard, we agree with Mr.

Pumphrey that the government's evidence of his intent was inadequate, and thus that his conviction for second-degree murder was, in this one respect, critically unsupported.[6]

Second-degree murder is statutorily defined as the "kill[ing] of another" "with malice aforethought." D.C. Code § 22-2103 (2012 Repl.). As this court explained in *Comber v. United States*, 584 A.2d 26, 38 (D.C. 1990), "malice aforethought has evolved into a term of art embodying several distinct mental states": (1) "the specific intent to kill," (2) "the specific intent to inflict serious bodily harm," or (3) "a wanton and willful disregard of an unreasonable human risk," also known as "depraved heart malice." *Id.* at 38-39 (internal quotation marks omitted). With regard to the third manifestation of "malice aforethought," this court has said that, although proof of specific intent is not required, the bar is nonetheless high for the government: "such depraved heart malice exists only where the perpetrator was subjectively aware that his or her conduct created an extreme risk of death or serious bodily injury, but engaged in that conduct

---

[6] Because we determine that the evidence was insufficient to sustain his conviction for second-degree murder and PFCV, we need not reach Mr. Pumphrey's challenges to the trial court's severance ruling, the court's ruling regarding the admission of evidence of threats by Ms. White to Ms. Adams, or the court's jury instructions.

nonetheless." *Id.* at 39.

It is the rare case where the defendant will clearly articulate his intent before he acts, and intent must often be inferred. *See Jones v. United States*, 716 A.2d 160, 166 (D.C. 1998). Specific intent to kill or to inflict serious bodily harm may be inferred from a defendant's actions. *See*, *e.g.*, *Graure v. United States*, 18 A.3d 743, 759-60 (D.C. 2011) (finding sufficient evidence for inference that appellant had a specific intent to kill where appellant poured gasoline on victim and ignited a lighter); *Castillo-Campos v. United States*, 987 A.2d 476, 487 (D.C. 2010) (finding sufficient evidence for inference that appellant had a specific intent to kill where there was animosity between the appellant and the victim, and the accused shot at a particularly vulnerable area of the body); *Perez v. United States*, 968 A.2d 39, 102 (D.C. 2009) (finding sufficient evidence of intent to inflict serious bodily harm where appellant fought with his friend over a knife—which he eventually handed to the friend who stabbed the deceased—because he wanted to do the stabbing himself, or alternatively, from appellant's "joining in a group assault and viciously kicking" the victim); *Gray v. United States*, 585 A.2d 164, 165 (D.C. 1991) (finding sufficient evidence for inference that appellant had a specific intent to kill where he fired three shots from a double-barreled shotgun through a screen door in the direction of three children, twenty to thirty feet away); *Fletcher v. United*

*States*, 335 A.2d 248, 250-51 n.5 (D.C. 1975) (finding sufficient evidence for inference that appellant had a specific intent to kill where appellant fired at police at close range before they drew their guns). Likewise, depraved heart malice can be inferred from a defendant's conduct, for example, where a defendant:

> Fir[es] a bullet into a room occupied, as the defendant knows, by several people; start[s] a fire at the front door of an occupied dwelling; shoot[s] into . . . a moving automobile, necessarily occupied by human beings; [or] play[s] a game of "Russian roulette" with another person.

*Comber*, 584 A.2d at 39 n.13.

In this case, however, the record contains neither direct evidence nor adequate circumstantial evidence from which one could make reasonable inferences, versus unsupported speculations, about Mr. Pumphrey's intent. Ms. Adams, the sole eyewitness to the shooting presented by the government at trial, testified only about a sliver of time during which she looked through her bedroom window and saw Mr. McKnight and Mr. Jennings already engaged in an argument, with Mr. Pumphrey standing nearby. She provided no evidence that Mr. Pumphrey had any interest or involvement in this argument. She knew Mr. Pumphrey and Mr. McKnight, but she did not or could not say whether either man had a prior relationship with Mr. Jennings. She could not say what the argument between Mr.

McKnight and Mr. Jennings was about; she could not hear much of what Mr. McKnight and Mr. Jennings were saying. She provided no evidence that Mr. Pumphrey had any reason to be present other than the fact that he was driving the car in which Mr. McKnight was the passenger. Thus, Ms. Adams provided the jury with no context for what she said she saw and heard next.

Ms. Adams testified that she saw Mr. Jennings walk to the trunk of his car and begin rifling through its contents. She testified that she heard Mr. Pumphrey say, "he's looking for something, he's looking for something," possibly indicating that Mr. Pumphrey thought Mr. Jennings was seeking to arm himself. She stated that she then saw Mr. Pumphrey retrieve a gun from the passenger-side of his car and hand it to Mr. McKnight. She gave very little information about what Mr. Pumphrey did or how he acted after he handed Mr. McKnight the gun, testifying only that Mr. Pumphrey was walking back to the car when Mr. McKnight shot Mr. Jennings. From these facts, it is reasonable to infer that Mr. Pumphrey wanted Mr. McKnight to have the gun for protection in case Mr. Jennings was looking for a weapon. But it cannot reasonably be inferred with the requisite certainty to support a finding of guilt beyond a reasonable doubt, that Mr. Pumphrey intended for Mr. McKnight to shoot Mr. Jennings, or that he was subjectively aware that he

was creating an extreme risk that Mr. McKnight would shoot Mr. Jennings without the justification of self-defense.

Finally, Ms. Adams gave no testimony about events after the shooting from which one could determine that Mr. Pumphrey intended Mr. McKnight to shoot Mr. Jennings or should have reasonably appreciated that there was an extreme risk that Mr. McKnight would do so. She provided no testimony of any sort about Mr. Pumphrey's demeanor after the shooting—e.g., that he was unafraid and unsurprised, or even approving. She testified only that Mr. McKnight got into Mr. Pumphrey's car and Mr. Pumphrey drove him away.

Certainly one could speculate (as the government invited the jury to do at trial) that Mr. McKnight and Mr. Pumphrey were part of some sort of gang or crew, that this block of the District was their turf, that Mr. Jennings had crossed some line or broken some rule, and that they purposefully shot him to enforce their neighborhood control.[7] But as defense counsel rightly argued to the jury, this

---

[7] As a basis for this, the government argued in closing that the evidence showed that Mr. McKnight and Mr. Pumphrey were "out there each and every day, hanging out, playing basketball at all hours of the night at the elementary school," and that Mr. McKnight kept a gun hidden in various locations in the neighborhood. The government further argued to the jury that Mr. Jennings had defied Mr. McKnight and Mr. Pumphrey on the night of his death—that he had failed to "obey

(continued…)

theory was "made up out of thin air." And the government does not press this line of argument on appeal. Instead the government cites to two cases where it presented evidence at trial that the appellants had handed the gunman the gun and this court upheld appellants' convictions for second-degree murder based on an aiding and abetting theory: *Coleman*, 948 A.2d at 549-50, and *Howard v. United States*, 656 A.2d 1106 (D.C. 1995). Beyond the hand-off of a gun, neither case has analogous facts.

In *Coleman*, the appellant discovered the shooting victims breaking into his car. 948 A.2d at 539. He walked toward them carrying a gun, handed the gun to the co-appellant shooter, and patted down the victims' pockets. *Id.* at 539-40. The co-appellant then asked the appellant what he was "going to do about this here?" *Id.* at 542. Appellant responded "fuck 'em," seemingly prompting his co-appellant to shoot. *Id.* Unlike in *Coleman*, the government in this case presented no backstory regarding Mr. McKnight and Mr. Pumphrey's encounter with Mr.

---

(…continued)

their command, whatever it is they told him to do"—and Mr. Jennings "pa[id] with his life." But "hanging out" and playing basketball, even at odd hours of the day, coupled with the act of hiding a gun outside one's house does not create an adequate foundation for an inference that Mr. McKnight and Mr. Pumphrey were two fearsome men who held a city block captive and who were enforcing their control over that block when Mr. McKnight shot Mr. Jennings.

Jennings that might have explained his shooting as an act of purposeful retribution. And unlike *Coleman*, there was no evidence that Mr. Pumphrey said anything to encourage or, at a minimum, to indicate his reckless indifference to Mr. McKnight's use of the gun.

In *Howard*, the appellant, like Mr. Pumphrey, warned his companion that he was in danger and handed his companion a gun; his companion then shot the victim, and left the scene with appellant. 656 A.2d at 1110. But there the factual similarity ends. The government in *Howard* presented much more contextual information for the shooting from which intent could be inferred. Critically, the shooter had already shot at the victim twice with a different gun before the appellant handed the shooter a second gun. *Id.* In other words, unlike in this case, whether or how the shooter would use the gun was no longer in question. In addition, the government in *Howard* presented evidence that prior to the shooting, appellant had known of, and formed an intent to participate in, a plan to kill the victim. The government established that appellant knew the shooter had "beef" with the victim and his friends, had "helped him dig up the weapons," and then accompanied him to the scene of the shooting. *Id.* at 1110.

Unlike in *Coleman* and *Howard*, the government did not present sufficient

evidence from which a reasonable juror could infer that Mr. Pumphrey acted with the requisite malice aforethought. Consequently, Mr. Pumphrey's convictions for second-degree murder and related PFCV cannot stand.

### B.     Mr. McKnight

On appeal, Mr. McKnight argues that (1) the trial court abused its discretion[8] by allowing witness Shanicka Adams to testify about having been threatened (by someone other than Mr. McKnight or Mr. Pumphrey) in connection with her testimony in the case, and (2) plainly erred[9] by allowing the government to engage in improper closing argument, notwithstanding defense counsel's failure to object. We find these claims to be without merit, and accordingly affirm Mr. McKnight's convictions.

We begin with Mr. McKnight's challenge to the trial court's admission of Ms. Adams' testimony that she was "scared" and that she had been threatened. The trial court allowed the government to present this evidence to explain why Ms.

---

[8]  *Ebron v. United States*, 838 A.2d 1140, 1148 (D.C. 2003) ("Evaluating and weighing evidence for relevance is within the trial court's discretion.").

[9]  *Harrison v. United States*, 60 A.3d 1155, 1169 (D.C. 2012).

Adams had not told her mother about being an eyewitness to the shooting until "today," the day of her trial testimony. (Curiously, Ms. Adams had said much the same thing when she testified before the grand jury years earlier, explaining that she had not told her mother until "just this morning" that she "was in the window when it happened.") Mr. McKnight argues that the evidence about the threat to Ms. Adams and her consequent fear was more prejudicial than probative and was improperly admitted under *Mercer v. United States*, 724 A.2d 1176 (D.C. 1999).[10]

Whether or not the trial court's admission of this evidence was proper, we see no possibility of prejudice under the particular circumstances of this case. To begin with, this testimony was brief, and it was accompanied by a limiting instruction directing the jury that there was no connection between Mr. McKnight (or Mr. Pumphrey) and the alleged threat to Ms. Adams the week before trial. But more importantly, the government had separately charged Mr. McKnight with obstruction of justice, and in its effort to prove his guilt of that crime, had presented other far more powerful evidence that Mr. McKnight had schemed to

---

[10] In *Mercer* we explained that evidence of witness intimidation has "potential for great prejudice" to the defendant and should only be admitted "to explain specific behavior of the witness, such as inconsistent statements, delay in testifying, or unusual courtroom demeanor." 724 A.2d at 1184; *see Ebron*, 838 A.2d at 1148.

threaten and forcibly prevent Ms. Adams from testifying at trial. Specifically, the government entered into evidence the audio of several phone calls made by Mr. McKnight to his sister and father while he was in pretrial detention. In one call, for example, Mr. McKnight urges his father to "use a knife" on a woman reasonably understood to be Ms. Adams. Against this evidentiary backdrop, the prejudice from any improperly admitted evidence regarding threats to Ms. Adams a week before trial by someone unconnected to Mr. McKnight was at most *de minimis*.

Mr. McKnight also challenged the trial court's failure to take corrective action in response to the government's improper closing argument, in which the prosecutor alleged that Mr. McKnight and Mr. Pumphrey controlled the neighborhood block and commanded that the community "obey" them. In so doing, Mr. McKnight claims that the prosecutor argued facts not in evidence and distorted inferences to be drawn from those facts that were. We agree that the prosecutor's argument was only tenuously connected to the evidence presented at trial. See *supra* note 7. But as Mr. McKnight concedes, because trial counsel did not object, our review of the government's argument is limited to plain error. *See Daniels v. United States*, 2 A.3d 250, 263 (D.C. 2010).

To establish plain error, an appellant must show: (1) error, (2) that is plain, (3) that affects his substantial rights, and (4) that compromises the fairness, integrity, or public reputation of the judicial proceeding. *See Lowery v. United States*, 3 A.3d 1169, 1173 (D.C. 2010). Mr. McKnight falters on the third prong of our plain error test; he "cannot demonstrate that these comments . . . seriously affected his substantial rights." *Daniels*, 2 A.3d at 263. Based on the testimony of Ms. Adams, the officers who responded to the scene, and the medical examiner, the government presented uncontested evidence that Mr. McKnight shot Mr. Jennings, who was unarmed, multiple times in the back as he was trying to run away. That evidence amply established his guilt of first-degree premeditated murder while armed.[11]

### III. Conclusion

For the reasons set forth above we reverse Mr. Pumphrey's convictions for second-degree murder while armed and PFCV. We affirm Mr. Pumphrey's

---

[11] This court has determined that premeditation requires a showing that "before acting, [defendant] 'gave thought to the idea of taking a human life and reached a definite decision to kill.'" *Harris v. United States*, 668 A.2d 839, 841-42 (D.C. 1995) (quoting *McAdoo v. United States*, 515 A.2d 412, 427 (D.C. 1986)). Premeditation "may be inferred from the surrounding facts and circumstances, and may occur in a period 'as brief as a few seconds.'" *Id.* at 842 (quoting *Ruffin v. United States*, 642 A.2d 1288, 1291 (D.C. 1994)).

remaining gun charge. We also affirm Mr. McKnight's convictions for first-degree murder while armed, PFCV, unlawful possession of a firearm by a convicted felon, and obstruction of justice.

*So ordered.*

PRYOR, *Senior* Judge, dissenting in part: The question on appeal in this case is whether there was sufficient evidence of appellant Pumphrey's homicidal state of mind (as an aider and abettor) to warrant submission of a murder charge against him to the jury.

At about two o'clock a.m. in the morning, in a residential neighborhood, appellant McKnight was arguing with the decedent, who was seated inside of a car. McKnight was standing outside of the car. As the argument ensued, the decedent exited the car, opened the rear trunk and began a search which included throwing items on the ground. McKnight and decedent were then standing next to each other. Pumphrey was standing nearby outside of a second car watching the two men. A woman was also standing next to a third car observing the situation.

Pumphrey warned McKnight that decedent was looking for something. He then obtained a loaded gun from his car and handed it to McKnight. As soon as decedent saw the gun, he started to run away. McKnight fired multiple shots and decedent's body was later found on the ground where he was killed. Pumphrey and McKnight left the scene immediately in Pumphrey's car. The woman also left in her car. Arriving police officers noticed both cars leaving as they responded to the scene. A neighbor, who observed a part of this encounter, testified that she had seen appellants together with a gun on an earlier occasion.

In *Jackson v. Virginia*, 443 U.S. 307 (1979), the Supreme Court stated the guiding concept which this court and others have consistently applied. Recognizing that the jury has heard the evidence, and observed the demeanor of the witnesses, the reviewing court should evaluate the evidence in the light most favorable to prosecution and determine whether a rational juror *could* find proof of the elements of the offense beyond a reasonable doubt. Stated conversely, the proof is insufficient if no rational juror *could* find proof of the offense beyond a reasonable doubt. In my opinion there is a tension in the test between "taking the evidence in the light most favorable to the prosecution" and concluding "there is proof beyond a reasonable doubt." By design, I think, the sufficiency test, contemplates that the jury will consider, deliberate and reach a verdict which

travels the space between the government's best case and the standard of proof to convict. The court, as a gate keeper, need not render a verdict but rather should exclude from the jury, as a matter of law, those cases where conviction would be irrational and without evidence to satisfy the standard of proof.

In this case the jury heard the evidence and listened to the argument of counsel about the intent of Pumphrey. They were instructed by the trial judge consistent with our standard instructions. Indeed in deciding the case, the jury was free to apply the customary instruction to evaluate intent by evidence of the surrounding circumstances.[1] In this regard the jury was free to draw reasonable inferences from the total evidence. Although there was no direct evidence of

---

[1] "Proof of state of mind: Someone's [intent] [knowledge] [insert other appropriate state of mind] ordinarily cannot be proved directly, because there is no way of knowing what a person is actually thinking, but you may infer the someone's [intent] [knowledge] [other appropriate state of mind] from the surrounding circumstances. You may consider any statement made or acts [done] [omitted] by [name of the defendant], and all other facts and circumstances received in evidence which indicate his/her [intent] [knowledge] [other appropriate state of mind].

[You may infer, but are not required to infer, that a person intends the natural and probable consequences of acts s/he intentionally did or did not do.] It is entirely up to you, however, to decide what facts to find from the evidence received during this trial. You should consider all the circumstances in evidence that you think are relevant in determining whether the government has proved beyond a reasonable doubt that [name of the defendant] acted with the necessary state of mind." Standardized Criminal Jury Instructions for the District of Columbia, No. 3.101 (5th ed. rev. 2013).

Pumphrey's *mens rea*, there were circumstances which the jury could properly consider. They could consider that Pumphrey handed a loaded gun to McKnight in the course of a heated argument. They could also consider that the appellants immediately left the scene together. Lastly, only the jury could decide the accuracy of the testimony of the neighbor-witness and what inferences, if any, to draw from her testimony.

On balance, I am not persuaded that the verdict was the result of speculation or without evidence to support it. I, therefore, vote to affirm all of the convictions.