*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 08-CF-725; 08-CF-879; 08-CF-914

BRIAN K. GILLIAM, JOHN A. DANIELS, and RONALD L. ENGLISH, APPELLANTS,

V.

UNITED STATES, APPELLEE.

Appeals from the Superior Court
of the District of Columbia
(CF1-15379-07; CF1-14765-07; CF1-16618-07)

(Hon. Geoffrey M. Alprin, Trial Judge)

(Argued January 25, 2013                                    Decided November 21, 2013)

*Montrell L. Scaife* for appellant Brian Gilliam.

*Thomas T. Heslep* for appellant John Daniels.

*Jonathan W. Anderson*, Public Defender Service, with whom *James Klein*, Public Defender Service, was on the brief, for appellant Ronald English.

*Anne Y. Park*, Assistant United States Attorney, with whom *Ronald C. Machen Jr.*, United States Attorney, *Roy W. McLeese III*, Assistant United States Attorney at the time the brief was filed, and *John P. Mannarino* and *S. Vinet Bryant*, Assistant United States Attorneys, were on the brief, for appellee.

Before GLICKMAN, FISHER and OBERLY, *Associate Judges*.

GLICKMAN, *Associate Judge*:  Early on the morning of January 5, 2006, a shooting on 37th Street in Southeast Washington, D.C., left a man named Anthony Knight dead and two others injured.  The government prosecuted appellants Gilliam, Daniels, and English for the crimes, charging them with conspiracy to murder Knight and with his first-degree murder while armed along with two counts of assault with intent to kill while armed and related firearms offenses.  The case against appellants rested on the credibility of Byron Holmes, an unindicted co-conspirator who had agreed to testify against appellants as part of his plea agreement.  According to Holmes, appellants pursued Knight after he left a nightclub in Maryland.  Holmes claimed that, after splitting up in Maryland, he and appellants reunited in the District at appellant English's house, armed themselves, and proceeded to 37th Street, where they found Knight and gunned him down.

No one other than Holmes identified appellants as the perpetrators of Knight's murder.  Appellants denied having anything to do with it and claimed that Holmes was shielding his actual accomplices.  The jurors had difficulty deciding the case—they deliberated for four days, sent three notes indicating they could not agree, and received an anti-deadlock instruction before they reached their verdict.  In the end, the jury acquitted appellants of the murder and assault charges but

found each of them guilty of conspiracy to murder Knight[1] and carrying a pistol without a license (CPWL).[2]

Appellants challenge their convictions on multiple grounds. Without having to address all of their claims of error, we conclude that appellants are entitled to a new trial in this close case because they were denied a brief continuance to call a witness who could have rebutted a key element of Holmes's testimony—his assertion that he and appellants met up in the District to arm themselves for Knight's murder.

## I. Evidence at Trial

### A. The Government's Case

#### 1. The Testimony of Byron Holmes

---

[1]  In violation of former D.C. Code § 22-1805a (2001) and D.C. Code § 22-2101 (2012 Repl.).

[2]  In violation of former D.C. Code § 22-4504 (a) (2001). Appellant English was convicted under subsection (a)(2) of committing the offense after previously having been convicted of a felony (for which enhanced punishment is authorized).

Byron Holmes was the government's crucial witness. He testified that he knew appellants from the 17th Street S.E. neighborhood where he grew up and had been friends with them for several years before Anthony Knight's murder. Knight was not from their neighborhood, but they all knew him. He was a member of a 37th Street crowd that they often encountered at the Tradewinds Club, a nightclub in Maryland. There was, Holmes explained, a history of hostility between the two neighborhoods. On a recent visit to Tradewinds, 37th Streeters had given Holmes and appellants "jealous looks"; on another occasion, appellant Daniels had told Holmes, they had watched Daniels and followed him around the club.

On the evening of January 4, 2006, Holmes and Daniels decided to go to a concert at the Tradewinds Club. They drove to the club in Holmes's Chevy Tahoe. Holmes took a Bryco Arms 9mm semiautomatic pistol with him "for protection." At Tradewinds they met up with appellants Gilliam and English, who had driven there in Daniels's green Cadillac. Knight and some of his 37th Street friends were present at the club as well. Holmes noticed Knight and Daniels "mugging" or exchanging "funny" looks.

When the club closed at around 2 a.m., everyone left. Knight departed in a gold-colored Cadillac. Gilliam went with Daniels in the latter's car while English

left with Holmes. Holmes gave his handgun to English, who commented disparagingly on Knight's "mugging." As the two vehicles in which appellants and Holmes were riding came to the intersection of Branch Avenue and Silver Hill Road in Maryland, Holmes heard gunshots and felt something bump the rear of his SUV. Yelling "that's them," English jumped out with Holmes's gun in his hand. Holmes heard more gunshots and saw Daniels's car pursuing an "eggshell-colored" Cadillac down Silver Hill Road, with English chasing them on foot. The Cadillac was not the one Knight had driven off in, but it was the same color, and appellants allegedly mistook it for Knight's vehicle. Holmes, who had stopped his SUV and remained inside it, soon lost sight of Daniels's car. After the shooting ended, Holmes went to pick up English on Silver Hill Road. English, who had shot at the fleeing Cadillac with Holmes's gun, allegedly directed Holmes to take him home so he could retrieve his own firearm.[3]

Holmes testified that as he arrived at English's house at 18th and A Streets, S.E., he received a call on his cell phone from Daniels. Daniels wanted to know

---

[3] The shootings in Maryland were not charged as separate counts in appellants' indictments, but they were included among the overt acts listed in the conspiracy count.

where Holmes and English were so that he and Gilliam could rejoin them. Holmes claimed he told Daniels they were in the alley behind 18th and A.

When Daniels drove up a few minutes later, Holmes saw that the front of Daniels's car was damaged. Daniels explained that he accidentally had rammed the back of Holmes's Tahoe when "they were shooting." English, accompanied by Gilliam, went into his backyard and returned carrying a book bag. Daniels retrieved two boxes of ammunition from his car and appellants piled into Holmes's Tahoe. All four men were armed: Holmes had his Bryco 9mm pistol, Daniels had a .40 or .45 caliber handgun, and English withdrew a MAC-10 semiautomatic handgun from his book bag for himself and a gun for Gilliam. Holmes could not see the gun Gilliam received from English, but he heard Gilliam cock and load it.

Holmes drove the three men to 37th Street. At the intersection of 37th and Ely Streets, he observed a gold-colored Cadillac stopped in the street near a pickup truck. A few people were standing next to the two vehicles. Anthony Knight was one of them. At that point, English said "[t]hat was them" and began firing out the window. English then jumped out, followed by Daniels and Gilliam, while Holmes remained sitting at the wheel of his SUV awaiting their return. Holmes heard more shooting. The gold Cadillac started to drive away and Holmes fired at

it. When the shooting ceased, he looked back and saw Gilliam and English kneeling down and Daniels standing near them. Appellants then got back into his SUV and told Holmes to "go, go, go, go."

Holmes drove back to 18th and A Streets. On the way, he saw English and Daniels reload their guns and heard Gilliam do the same with his. In the alley behind English's house, before the four men split up, they cleaned out the Tahoe. English told Holmes that he and Knight had exchanged gunfire, and that when he ran out of bullets after wounding Knight, Daniels and Gilliam were "right there to finish him off."[4] Later that day, Holmes met again with English and Daniels. Daniels said he had lost his ID and asked whether Holmes had seen it; Holmes had not.

Holmes was arrested in November 2006. When questioned by detectives, he initially denied any involvement in Knight's murder, but under further interrogation Holmes eventually confessed and implicated appellants. Holmes also showed the police where he had hidden his gun (the Bryco) and they recovered it. He subsequently pleaded guilty to second-degree murder and conspiracy to murder

---

[4] The trial court ruled English's statement to Holmes admissible against his co-defendants under the co-conspirator exception to the hearsay rule.

and agreed to testify against appellants. Holmes was awaiting his sentencing when he took the stand at appellants' trial.

### 2. Other Evidence

Although Holmes was the only witness at trial who could identify appellants, other witnesses corroborated aspects of his testimony. The driver of the Cadillac attacked on Branch Avenue testified that he was shot at by a man in the passenger seat of a green Cadillac STS,[5] and the owner of a car repair shop testified that Daniels brought his dark green Cadillac STS in on January 5, 2006, for repair of damage to its front. A witness to the Branch Avenue shooting described the man she saw jump from a truck and the passenger she saw shooting a gun out the window of a green car.[6] To some extent her descriptions of the two men and their vehicles matched the appearances of English, Gilliam (though he offered evidence to the contrary), Holmes's Tahoe, and Daniels's Cadillac (though the witness thought the car she saw was a Honda Civic).

---

[5] According to the driver, the man put his hand out the car window "with the gun," and "started shooting."

[6] The witness recalled that the passenger in the green car "had a gun, and his arm was out the window, and he put it towards my driver's side window and started firing shots[.]"

None of the surviving witnesses to the shootings on 37th Street could describe the attackers. However, a wallet containing Daniels's driver's license and other identification was found lying in the street by one of the first police officers to arrive at the scene. The government also presented evidence that some of the bullets and cartridge cases recovered at the scene of the 37th Street shooting had been matched to a MAC-10 seized two months later when police stopped a car that English was driving.[7]

## B. Defense Cross-Examination and Evidence

Appellants claimed they were not present when Knight was killed and were being scapegoated for a murder that Holmes actually committed with other individuals.[8] Appellants cross-examined Holmes vigorously. They impeached him with the lies and inconsistencies in the stories he told the police following his

---

[7] The MAC-10 apparently had been thrown from the car just before it was stopped. Appellant Gilliam and a third man were with English in the car at the time.

[8] Daniels and English presented alibi witnesses. Arnold Marshall testified that he saw Daniels and a woman drive out of the Tradewinds Club parking lot early on the morning of January 5, 2006, in a silver or white Nissan. Marshall said he saw the pair again later that morning on the highway. Tennille Young, who was dating English in January 2006, testified that they left the Tradewinds in her car and that English was with her at the time of Knight's murder.

arrest, and they explored Holmes's motive to curry favor with the government in order to secure the benefits of his plea agreement, i.e., a reduced sentence. Holmes admitted that the police had pressured him and promised him leniency. He agreed that the detectives, unhappy with his initial answers, began to "feed" him "details about their version of the event" and were the first to suggest that appellants were the perpetrators. Holmes confirmed that it was a detective who suggested the outlines of the story he eventually told ("And then she tells you, look, you could simply have been giving some friends a ride and it went haywire; right?").

Before Holmes implicated appellants, he gave the detectives interrogating him the name of another friend from the 17th Street neighborhood, James "Whitey" Kelly, as someone with whom he had been to the Tradewinds Club. A defense witness (Arnold Marshall) testified that Kelly, who was deceased by the time of trial, was at the Tradewinds Club the morning of January 5, 2006. A second defense witness, Vincent King, testified that Holmes told him it was he and Kelly who had killed Knight.[9] Holmes denied this.[10]

---

[9] King, who acknowledged that he, Holmes, and appellants were "all part of the same crew" from the 17th Street neighborhood, testified that he had seen Holmes with a MAC-10 prior to January 2006, and that Holmes had used the weapon to commit an armed robbery with him. King further testified that Holmes told him in January 2006 that he and "Whitey" had shot Knight ("Little Ant") on

*(continued…)*

## C. Holmes's Cell Phone Records and the Denial of a Continuance

English's counsel undertook to disprove Holmes's testimony that Daniels and Gilliam met back up with him and English at 18th and A Streets to rearm after the shooting in Maryland. On cross-examination, Holmes reiterated his testimony that Daniels called him on his cell phone to find out where he and English had gone. Holmes confirmed that Daniels and Gilliam "knew where to go" as a result of that phone call. Holmes further testified that his cell phone number at the time was (202) 327-3690. Thereafter, in the defense case, English introduced the call detail records for that number through Sprint Nextel employee Bruce Levine. Levine testified that the number was registered to Holmes and in use on the

_____

*(continued…)*
37th Street, and that Holmes said he had used the MAC-10 and was trying to sell it because it was "dirty."

[10]    As noted below, Holmes's cell phone records indicated that he was in telephonic contact on the night of the homicide with Damian Turner, another friend from 17th Street. English's counsel attempted to ask Holmes whether, sometime before January 5, 2006, he had seen Knight assault Turner. The trial court sustained the government's objection to this inquiry on relevance grounds, rejecting appellant's argument that it bore on a possible third-party perpetrator defense and Holmes's possible motive to falsely implicate appellants in order to protect Turner from suspicion. (Turner, like Kelly, was deceased by the time of trial.)

morning of January 5, 2006. Contradicting Holmes's testimony, the call detail records showed no call at all between Holmes and Daniels that morning.[11]

On cross-examination, the prosecutor asked Levine whether he had obtained the records for another phone number, (202) 277-1049. Levine said he had not been asked to check that number and had not done so. The prosecutor next asked Levine if he knew whether Holmes had "any other cell phone with any other carrier." Levine had "no idea."

This was on a Thursday, and the court did not sit on Friday. On Monday morning, English's counsel brought up the prosecutor's cross-examination of Levine with the court. Stating that "the jury certainly could have been left with the impression [from the prosecutor's question about the number 277-1049] that Mr. Holmes had more than one phone in operation" in January 2006 (negating the

---

[11] Instead, the records revealed a series of calls between Holmes's cell phone and the phone numbers of two other people. Between 2:33 a.m. and 3:05 a.m. on January 5, 2006, the only number Holmes's phone called, or received a call from, was that of Holmes's girlfriend Latoya Richardson. In addition, between 9:30 p.m. on January 4, 2006, and 1:31 a.m. on January 5, 2006, there were nineteen calls between Holmes's phone and a number registered to his friend Damian Turner. Thereafter, between 3:21 a.m. and 4:44 a.m., there were four more calls to or from Turner's number. There were no other calls that morning involving Holmes's phone.

significance of Levine's testimony regarding Holmes's 327-3690 number), defense counsel informed the court that she had subpoenaed the records for the number the prosecutor had mentioned. Those records, counsel proffered, showed that the 277-1049 number was registered to Holmes but was not in operation *at all* between December 19, 2005, and January 18, 2006. Daniels therefore could not have spoken with Holmes on that number on the morning of January 5, 2006. Counsel stated that she wanted to put this information in evidence to dispel the (mis)impression the prosecutor's question could have left with the jurors.

There was, however, an obstacle that needed to be overcome. As counsel explained, the custodian of the records for the 277-1049 number, a Sprint Nextel employee named Laura Spencer, would be unable to appear before Wednesday, which was a holiday, meaning the witness would not be able to testify until Thursday morning. But closing arguments were scheduled to start before then, on Tuesday. Counsel therefore asked to be permitted to introduce the call records for 277-1049 with Spencer's authenticating affidavit (which had been obtained) in lieu of having to call Spencer to the stand. The phone records had been provided to the prosecutor. However, because the prosecutor refused to stipulate to their contents or waive the custodian's presence, the court denied the defense request. It also refused defense counsel's alternative request that the court instruct the jury

specifically that the prosecutor's question regarding the second phone number was not evidence. Faced with the rejection of those two alternatives to live testimony, counsel asked to be given time to call the records custodian to the stand on Thursday. The court denied this request as well, stating "it's a small point in the trial" and that it could not "wait that long."[12]

When court resumed the next morning (Tuesday), English's counsel renewed her request to introduce the records showing that Holmes could not have used a cell phone with the number 277-1049 to tell Daniels where to meet up with him and English on the morning of January 5, 2006. Daniels and Gilliam now joined in this request. Appellants' counsel argued that it was critically important to their defense to correct the misleading implication of the prosecutor's question and ensure that the jury did not assume (untrue) facts not in evidence—namely, that Holmes could have been called by Daniels on a second cell phone with the number the prosecutor had specifically mentioned. In opposition, the prosecutor rejoined

---

[12] After this, the trial continued. The defense presented three witnesses and rested shortly before noon on Monday. The prosecutor announced that the government would not present a rebuttal case. The rest of the day was taken up with discussion of instructions and other matters the court and counsel needed to address in preparation for submitting the case to the jury.

that the defense had cross-examined Holmes extensively and this was just "further impeachment."[13]

The court inquired why the defense could not "get the witness here today," and English's counsel explained that the relevant document custodian was in Kansas and that Bruce Levine was unable to provide the necessary testimony in her place.[14] Counsel pointed out that it was not until Levine's cross-examination that she became aware of the 277-1049 number.

As an alternative to bringing in the custodian of records to testify on Thursday, English's counsel proposed that the prosecutor could phone Ms. Spencer, ask her "whatever questions she wants," and then submit her responses in an affidavit. The prosecutor did not respond to that suggestion. The court stated that it could not admit a hearsay affidavit over objection and that "[t]he real

---

[13] Moreover, the prosecutor insisted, she had "a good faith basis to ask" Levine whether he had checked the records of Holmes's second cell phone number, because she "knew of the existence of more than one phone" even though she "didn't have the records." Thus, it appears the prosecutor did not know at the time of the cross-examination whether Daniels in fact had called Holmes on his second cell phone on January 5, 2006. It is unclear whether Holmes had told the prosecutor that Daniels called him on that phone.

[14] Counsel elaborated that the witness availability problem was a function of the merger of Sprint and Nextel and the different locations of the two companies' phone records.

question is should we wait two days?" Saying that it did not perceive the phone record evidence to be "critical," the court then ruled that it would not "delay the trial."[15]

The rest of Tuesday morning was taken up with further discussions between counsel and the court regarding jury instructions, the verdict form, the defendants' motions for judgment of acquittal, and other issues. At 11:59 a.m., the jury entered the courtroom. Closing arguments commenced a few minutes later. At 4:25 p.m., after the prosecutor and counsel for Gilliam and Daniels had delivered their closing arguments, the jury was excused with instructions to return on Thursday morning (as the court would not be in session on Wednesday, a holiday).

When court resumed on Thursday morning, English's counsel made a last-ditch attempt to salvage her cause. She asked the court to allow her to present the live testimony of the phone records custodian that morning via the Superior

---

[15] Defense counsel took one more stab, arguing that the court had the power to admit the phone records and Spencer's affidavit authenticating them as a sanction for the prosecutor's asking of a question that implied facts not in evidence. The court rejected that argument because it saw no fault on the government's part that would require any sanction. Finally, the court again refused counsel's alternative request for a specific curative instruction. The court said it simply would give the general instruction to the jury after closing arguments that questions are not evidence, "and you [i.e., defense counsel] can argue that."

Court's video conferencing facilities. Counsel said this would take only a few minutes, allow the government to cross-examine the witness, and "we would still close today," with the government having the opportunity to respond to the custodian's testimony in its rebuttal argument. "[T]he fact that no phone call was made," counsel again emphasized, "is an imperative point in our case, as the whole case rests on the credibility of . . . Byron Holmes."[16] Counsel for Daniels and Gilliam joined in the request. The prosecutor opposed it, arguing that the point was not material ("if it's even relevant"), and (perhaps somewhat inconsistently) that "to allow [the defendants] to reopen and highlight this particular piece of evidence at this juncture [would] cause the Government to reconsider certain decisions we made strategically with respect to our rebuttal case."[17]

The court expressed the view that, after "a three-week and two-day trial," it did not think the jury would "focus" on the phone call issue "unless you emphasize

---

[16] If the phone call from Daniels to Holmes never happened, counsel elaborated, Holmes's testimony "falls apart," because it was the phone call that allegedly brought the defendants and Holmes together at English's house to proceed with the charged conspiracy. Counsel pointed out that the meeting at English's house was one of the overt acts alleged in the conspiracy count of the indictment.

[17] The prosecutor did not disclose what those strategic decisions were or proffer any evidence that would have countered the defense proof that Holmes did not receive a call on his cell phone from Daniels.

it in your closing argument."[18]  Furthermore, the court said, reopening the case would set up "a possible need" for the government to present a case in rebuttal, which "would extend the trial [an]other day, maybe more."  Adhering to its prior rulings, the court denied the defense request to present the testimony of the phone records custodian that morning via a video conference hook-up.

In her closing argument, English's counsel hammered on Holmes's testimony about getting a phone call from Daniels and declared that the phone records showed that the call never happened:

> During that twenty-minute period where you'd have to have this phone call so you would know where to meet up so you could discuss what happened, and pile into [Holmes's] car, what are there?  There are five phone calls.  These all are Latoya Richardson [Holmes's girlfriend]. . . .  So that time period where he says this is how we all got together, because I made a phone call and we discussed where to meet, that didn't happen.  That's a lie, because his story is a lie.  Because most likely, he didn't even go anywhere near 17th Street.  He just drove right to the scene.

---

[18]  Actually, in their closing arguments on Tuesday, the attorneys representing Gilliam and Daniels already had focused the jury on the issue.  Each defense counsel argued that the phone records showed Holmes had lied when he testified to having been called by Daniels.

To rebut the prosecutor's suggestion that Holmes had another cell phone for which the defense had not presented call records, counsel argued:

> Now, when you look at these phone records, you will know that that's Byron Holmes's phone, and he was using it all night long, and who he was calling, because there's not going to be a question of did he have some other phone out there. But you were left potentially with the impression that maybe Byron Holmes has two phones. Well, if there's another phone out there that he was using, and they have phone numbers and somehow they can prove that, don't you think that [they] would bring–they'd bring that before you? Wouldn't that be important evidence for you to hear? Don't fall for the innuendo of questions that aren't evidence. . . . [T]he judge will instruct you that questions are not evidence.

In rebuttal, the prosecutor expressed disdain for the defendants' focus on "the lack of . . . corroborating evidence in the phone records that shows this call from John Daniels." The government, she simply asserted, had no need to prove how the defendants "got in contact with each other between the scenes; whether it was on [Holmes's] phone, on [English's] phone, on any—there's no allegation [in the indictment] as to there's this contact, and you have to believe that."

Following the closing arguments and a break for lunch, the court instructed the jury. Its instructions included a sound general instruction that lawyers'

questions are not evidence.[19] Thereafter, at 3:52 p.m. on Thursday afternoon, the jury retired to commence deliberations.

## II. Discussion

Appellants present multiple claims for relief in this court, each of which we will address below. We shall begin with the one claim above all others that compels us to grant appellants a new trial on all the counts of conviction.

### A. Denial of a Continuance

Appellants English and Daniels argue that the trial court abused its discretion in refusing to continue the trial to allow them to call another Sprint Nextel employee to testify that Holmes's cell phone number 277-1049 was not active on the morning of January 5, 2006. We agree that it was reversible error for

---

[19] The court instructed the jury on this point as follows:

> The statements and arguments of the lawyers are not evidence. They are only intended to assist you in understanding the evidence. Sometimes the lawyer's question suggests that something is a fact. Whether or not something is a fact depends on the witness's answer, not the lawyer's question. The lawyer's question is not evidence.

the court to deny the brief continuance necessary to enable English to present this evidence, as it was necessary to counter the prosecutor's implication, devoid of support in the evidence, that Holmes was called by Daniels on that number.

We review a ruling denying a continuance to secure a witness for abuse of discretion.[20] Our cases have identified several relevant factors to be considered by the trial court in deciding whether to grant such a continuance and by the reviewing court in determining whether discretion has been abused in its denial. These factors, as they present themselves to the appellate court, include (1) the probative value of the absent witness's proffered testimony, (2) the likelihood that the witness would have appeared if the continuance had been granted, (3) whether the party seeking the continuance exercised due diligence and proceeded in good faith, (4) the prejudice to that party from the denial of the continuance, (5) the prejudice to the opposing party had the continuance been granted, and (6) the duration of the requested continuance and any consequent disruption or delay of the trial.[21] While efficiency in the conduct of the trial is a laudable goal, it must

---

[20] *Daley v. United States*, 739 A.2d 814, 817 (D.C. 1999).

[21] *Id.*

yield when a party has demonstrated that a requested continuance is "reasonably necessary for a just determination of the cause."[22]

We think the trial court did not properly address, and to some extent may have overlooked, these factors.[23] To begin with, the court underestimated the probative value of the evidence that the defense sought to introduce. The truthfulness of Holmes's testimony that he received a call from Daniels on his cell phone was no small matter. It was critical to Holmes's account that appellants reassembled at English's house to arm themselves and proceed to 37th Street.[24] According to Holmes, appellants were able to regroup for this purpose after splitting up in Maryland *only* because Daniels called Holmes on his cell phone and

---

[22] *O'Connor v. United States*, 399 A.2d 21, 28 (D.C. 1979) (internal quotation marks omitted); *see also Ungar v. Sarafite*, 376 U.S. 575, 589 (1964) (cautioning that "a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend . . . an empty formality").

[23] *See Johnson v. United States*, 398 A.2d 354, 365 (D.C. 1979) ("The court reviewing the decision for an abuse of discretion must determine whether the decision maker failed to consider a relevant factor, whether he relied upon an improper factor, and whether the reasons given reasonably support the conclusion.") (internal quotation marks omitted).

[24] As previously noted, appellants were not charged in Superior Court with the earlier shootings in Maryland (offenses over which the Superior Court lacked jurisdiction). The prosecution had to prove appellants guilty of the charged criminal conduct in the District of Columbia.

found out from him where to meet. Thus, if appellants could adduce evidence proving that Holmes never received such a call, it would be no mere technicality. It would impeach the pivot of Holmes's testimony and cast doubt on his entire story that he and appellants joined forces in the District to murder Knight.

The call detail records maintained by the phone company for the only cell phone number to which Holmes testified appeared to supply such powerful impeachment, and in a form that was hard for the government to contest. But, to a degree that the court did not seem to recognize, the prosecutor blunted and deflected this evidence by implying in her cross-examination that it had *no force at all* because the defense had obtained the records for the wrong cell phone number. Lending concreteness to this implication, the prosecutor even specified the ten-digit phone number that had not been investigated. There was no ambiguity in the question that the prosecutor asked; the jury undoubtedly understood it as meaning that Holmes had a second cell phone with the number the prosecutor recited, on which Daniels must have called him.[25] There was, of course, no evidence of this in

---

[25] The prosecutor's follow-up question to Levine—she asked if he knew whether Holmes had "any other cell phone with any other carrier"—served to underscore the point. And the prosecutor's truncated remark in her rebuttal argument (it did not matter, she stated, whether Holmes and Daniels communicated "on [Holmes's] phone, on [English's] phone, on any—") reminded the jury of the second phone possibility.

the record, and the prosecutor never proffered or undertook to supply it; nor, clearly, did she expect to elicit the evidence by putting her question to Levine. Thus, the prosecutor's question was not "a small point in the trial," as the trial court characterized it.  It had the real potential to mislead the jury into assuming facts not in evidence, to the serious detriment of appellants' defense.  It is immaterial that the prosecutor may have had a good faith basis to ask the question and did not intend to mislead the jury.[26]  "Ultimately, it is not the intent or *bona fides* of the prosecutor that matter in this context[.]"[27]  The question "threatened to plant a false and damaging insinuation and should not have been asked."[28]

So appellants had strong reason and justification to counter the prosecutor's implication and prove it false, and in the proffered phone company records for the number the prosecutor had mentioned, they had the evidence with which to do just that.  By all indications, this evidence would have been compelling; there is no

---

[26]  *See Woodard v. United States*, 56 A.3d 125, 128 (D.C. 2012) (noting that "even unintended misleading remarks can have [a] potential impact on the jury," and that "[a] statement may be technically accurate or factually correct but still misleading based on the natural and reasonable inferences it invites") (internal quotation marks omitted).

[27]  *Id.* at 128.

[28]  *Rowland v. United States*, 840 A.2d 664, 683 (D.C. 2004).

sign that the government would have been able to refute or undermine it. It would have supported a considerably stronger closing argument that Holmes *demonstrably* had fabricated at least some of his accusations against appellants, and that the government had no sufficient rejoinder. The prosecutor would not have found it so easy in rebuttal to dismiss the evidence with a rhetorical wave of the hand by merely alluding to the possibility of other phones and disavowing any obligation to prove exactly how Daniels and Holmes communicated.

There appears to be no genuine dispute that Holmes's second cell phone was not in operation on the morning of January 5, 2006. In other words, there is no dispute that the inference jurors readily could have drawn from the prosecutor's question was false. It therefore is dismaying that, after personally inspecting the phone records and having an opportunity to contact the Sprint Nextel records custodian, the prosecutor objected to the relief appellants sought; equally dismaying that the court did not acknowledge *its* duty to take appropriate action.

We perforce conclude that the probative value of the phone records weighed heavily in favor of granting the requested continuance. So, too, did each of the other relevant factors. The likelihood that the records custodian would appear in court was high; she manifested her cooperation by furnishing an affidavit and no

one questioned counsel's representation that she would appear by Wednesday. There likewise is no question as to the diligence and good faith shown by English's counsel, who immediately investigated the second cell phone number after the prosecutor disclosed it and promptly shared the records for that number with the prosecutor. For the reasons we already have given, the prejudice to the defense from the denial of a continuance was substantial—a powerful defense argument was unfairly deflated. Conversely, there was no reason to fear that the government would have been prejudiced had the continuance been granted. Having injected the second cell phone number into the trial, the government was in no position to complain of the defense effort to address it.

Lastly, "[n]eutralizing the misleading impression the prosecutor [had] fostered would not have derailed the trial."[29] The trial court erred in stating that granting the continuance would mean delaying the trial for two days. Because closing arguments did not begin until Tuesday afternoon, and Wednesday was a holiday, allowing English to call the Sprint Nextel document custodian on Thursday morning as his final witness would have delayed the proceedings by only

---

[29] *Woodard*, 56 A.3d at 129.

half a day to a day at most.[30]   Under the circumstances, such a delay would have

been *de minimis*, and hardly a sufficient reason to refuse the continuance.   It

certainly would not have been "an unfair price to exact" to correct any

misimpression the prosecutor's questioning created in the minds of the jurors.[31]

We hold that the trial court exercised its discretion erroneously in denying

the continuance appellants requested.   Given the closeness of the case (strikingly

manifested in the end by appellants' acquittals on the principal substantive charges

of murder and assault), the centrality of the testimony that the excluded evidence

would have refuted, and the court's rejection of the alternative corrective measures

the defense proposed (admission of the phone records without live testimony from

the custodian,[32] an immediate and specific curative instruction), we cannot deem

the error harmless.   Although Holmes was cross-examined vigorously and

---

[30]   There is no reason to suppose that such a brief delay would have inconvenienced the jury.  Indeed, because the witness's testimony would have been predictably brief, there is every reason to think the jury would have been able to begin its deliberations not much later on Thursday than it actually did.

[31]   *Id.*

[32]   The court might have considered the option of allowing the defense to introduce the phone records in evidence without testimony from the custodian under the doctrine of "curative admissibility" in order to correct the misimpression implied by the prosecutor's question. *See, e.g., Mercer v. United States,* 724 A.2d 1176, 1192 (D.C. 1999).

impeached with his prior false statements to the police and his agreement to testify against appellants in exchange for benefits at sentencing, the phone records were the only hard proof that Holmes's in-court testimony was false.[33] Had the jury been persuaded of that by records proving Daniels never called Holmes on the morning of January 5, 2006, it could well have disbelieved virtually everything Holmes said regarding appellants' activities that morning and acquitted them of both the conspiracy and the handgun charges—the only charges of which they were found guilty. And while English's counsel eventually confronted the implication of the prosecutor's question directly in her closing argument and invoked the court's anticipated general instruction that suggestions in attorneys' questions are not evidence, those palliatives were not an adequate substitute for the hard evidence the court excluded. We are not persuaded that they dispelled the impact of the prosecutor's clear implication, which had been allowed to percolate in the jurors' minds for an entire week without antidote.[34] All things considered,

---

[33] "We have held that even where a prosecution witness has been 'substantially impeached,' the trial court's refusal to permit further and different impeachment may warrant reversal of the defendant's conviction." *Bennett v. United States*, 797 A.2d 1251, 1258 (D.C. 2002).

[34] *Cf. Boyde v. California*, 494 U.S. 370, 384 (1990) ("[A]rguments of counsel generally carry less weight with a jury than do instructions from the court."); *Scott v. United States*, 619 A.2d 917, 926 (D.C. 1993) (holding that a prosecutor's improper questioning on cross-examination did not necessitate

*(continued…)*

we cannot be confident that the denial of a continuance to call the phone records custodian did not substantially affect the jury's verdict.[35]

At trial, all three appellants joined in the request for a continuance and so preserved their objection to the court's ruling. The denial of a continuance affected all the appellants equally. On appeal, however, only English and Daniels briefed the issue. We have no reason to imagine that Gilliam's failure to do so reflected a deliberate strategic choice on his part. Had this court thought it useful, we could have invited Gilliam to address the denial of a continuance in a supplemental brief (in which case he surely would have aligned himself with his co-appellants).[36] There was no need to invite further briefing, however, as English and Daniels presented us with a full exposition. The government, of course, has

---

*(continued…)*
reversal where, *inter alia*, the court gave an "immediate" curative instruction emphasizing that the questions were not evidence).

[35] *See Kotteakos v. United States*, 328 U.S. 750, 765 (1946); *Woodard*, 56 A.3d at 129.

[36] *See Randolph v. United States*, 882 A.2d 210, 226 (D.C. 2005) ("[N]o matter whose ox is gored, this court has frequently requested post-argument briefing of issues not adequately raised by counsel, to the end that, after both parties have been fully heard, the court is in the best position to render a sound decision.") (citing *Watkins v. United States*, 846 A.2d 293, 296 (D.C. 2004), and *Outlaw v. United States*, 632 A.2d 408, 410-11 (D.C. 1993)).

had a full opportunity to respond and to defend the trial court's ruling on appeal. And our analysis and holding that the court abused its discretion apply as much to Gilliam as they do to his co-appellants.

For those reasons, we deem it in the interests of justice to reverse Gilliam's convictions along with those of English and Daniels.[37]

## B. Appellants' Other Claims of Error

In view of our disposition of the preceding issue, we find it unnecessary to decide whether some of appellants' other claims of error would entitle them to relief; and in our view, none of the rest require extended discussion. We address the latter claims first.

---

[37] *See, e.g.*, *Walker v. United States*, 982 A.2d 723, 738 (D.C. 2009) (reversing convictions of two appellants for insufficiency of the government's evidence, even though only one of the appellants challenged his convictions on that ground); *Jennings v. United States*, 431 A.2d 552, 555 n.3 (D.C. 1981) (same).

**1. Sufficiency of the Evidence to Support Gilliam's CPWL Conviction**

Gilliam argues that the government failed to present sufficient evidence to convict him of carrying a pistol without a license ("CPWL").[38] Viewing the evidence, as we must, in the light most favorable to the government,[39] we disagree.

To convict Gilliam of CPWL, the government had to prove that he carried an operable pistol without a license to do so.[40] Three witnesses at trial put a gun in Gilliam's hand: Holmes, who did not see it, but who heard Gilliam cock and load a gun apparently given to him by English; and two of the witnesses to the Branch Avenue shooting, who saw the passenger in Daniels's car reach out the window and fire a gun he was holding in his hand. (From Holmes's testimony, the jury could infer that the passenger in Daniels's car was Gilliam and that he brought the gun he fired on Branch Avenue into the District.) The government also presented

---

[38] We address this contention on its merits inasmuch as Gilliam's retrial on the CPWL charge would be barred if the government's proof of that charge at his first trial was insufficient.

[39] *Rivas v. United States*, 783 A.2d 125, 134 (D.C. 2001) (en banc).

[40] *See Campos v. United States*, 617 A.2d 185, 187 (D.C. 1992) (listing elements of the offense). Subsequent amendments of the D.C. Code have abolished the requirement that the pistol be operable. *See* D.C. Code §§ 7-2501.01 (9), 7-2501.01 (12), & 22-4501 (6) (2012 Repl.).

competent and undisputed testimony that Gilliam was not licensed in the District of Columbia to carry a pistol. This evidence was enough to permit a reasonable jury to find beyond a reasonable doubt that Gilliam carried an operable gun in the District of Columbia without a license.

For that gun to have been a "pistol" for purposes of CPWL, its barrel had to be less than 12 inches in length.[41] Although Gilliam argues there was no testimony about the barrel length of his weapon, the evidence allowed the jury to infer that it was less than a foot.[42] Holmes's testimony, that the weapon Gilliam was handling in his SUV had been stowed with another handgun inside English's book bag and was unobtrusive enough that Holmes could not see it, implied that it was a small enough gun to be a pistol. The fact that witnesses saw the passenger in the green car on Branch Avenue (i.e., Gilliam) shooting a gun that he held in one hand sticking out the window also implied that the weapon was small enough to be a pistol. We conclude that the evidence permitted a reasonable jury to convict Gilliam of CPWL.

### 2. Daniels's Second Amendment Claim

---

[41] *See* former D.C. Code § 22-4501 (a) (2001).

[42] *See, e.g.*, *Brown v. United States*, 979 A.2d 630, 637-38 (D.C. 2009).

Daniels argues that because the jury acquitted him of the crimes committed on 37th Street, it convicted him of CPWL only for carrying a handgun innocently (albeit without a license) outside his home or place of business in the District of Columbia. Moreover, he asserts, there is no evidence that he carried the handgun in such a way as to conceal it from public view. Claiming that he had a Second Amendment right to carry a handgun openly on the city's streets, and given that the District's handgun ban at the time made it impossible for a citizen to obtain a handgun license, Daniels argues that under *Heller v. District of Columbia*[43] the CPWL statute cannot constitutionally be applied to him.[44] Daniels asserted his Second Amendment claim in the trial court, which denied it in accordance with then-governing precedent,[45] so he preserved the claim for appellate consideration. Our review is *de novo*.[46]

---

[43] 554 U.S. 570 (D.C. 2008).

[44] Daniels's claim concerns the CPWL statute as it existed in 2006. It is settled that this statute was not unconstitutional on its face. *See Plummer v. United States*, 983 A.2d 323, 339 (D.C. 2009).

[45] The trial was conducted prior to the Supreme Court's decision in *Heller*.

[46] *See Gamble v. United States*, 30 A.3d 161, 164 n.6 (D.C. 2011). We address this contention on its merits because, if Daniels is correct, the government would be precluded from reprosecuting him for the offense on remand.

The Supreme Court has not declared that the Second Amendment guarantees a right to carry a handgun openly outside the home.[47]   But if there is such a right, it is "not unlimited."[48]   As the Supreme Court emphasized, "we do not read the Second Amendment to protect the right of citizens to carry arms for *any sort* of confrontation[.]"[49]   Rather, the right recognized in the Second Amendment derives from "the inherent right of self-defense" (including, especially if not exclusively, defense of the home).[50]   Thus, for Daniels (who was not at home) to have even a colorable constitutional claim, he must be able to point to evidence that he carried his handgun for legitimate self-defense.[51]   There is no such evidence in the record of this case.   Furthermore, in response to a jury note inquiring whether appellants

---

[47]   *Cf. id.* at 164-66 (holding that there is no Second Amendment right to carry a concealed weapon).

[48]   *Heller*, 554 U.S. at 595.

[49]   *Id.*; *see also id.* at 626 ("Like most rights, the right secured by the Second Amendment is not unlimited.   From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.").

[50]   *Id.* at 628; *see also Smith v. United States*, 20 A.3d 759, 764 (D.C. 2011) (noting that *Heller*'s focus was on the right to use firearms "in defense of hearth and home") (internal quotation marks and emphasis omitted).

[51]   *See Smith,* 20 A.3d at 764 (holding that "appellant's Second Amendment contention [that he had a constitutional right to carry a firearm for innocent, work-related reasons] fails" for want of "indicia in the record" that he was carrying the weapon for self-defense); *see also Snell v. United States*, 68 A.3d 689, 693 n.5

*(continued…)*

could be found guilty of CPWL for carrying pistols without a license in the Branch Avenue incident or only in connection with the murder of Knight, the court specifically instructed the jurors that "with respect to [the CPWL counts], you may not convict unless you find beyond a reasonable doubt that each defendant carried a pistol without a license in the District of Columbia on January 5, 2006, *in connection with the homicide of Anthony Knight*." Because we presume that the jury followed this instruction,[52] we are confident that it found Daniels carried a handgun in anticipation of committing a crime of violence, which clearly is not a purpose protected by the Second Amendment.[53] Daniels therefore has not shown

---

*(continued…)*
(D.C. 2013) ("In any case, there was no evidence that on July 4, 2010, Snell carried a gun for the purpose of self-defense."); *Kachalsky v. Cnty. of Westchester*, 701 F.3d 81, 100 (2d Cir. 2012) ("In light of the state's considerable authority—enshrined within the Second Amendment—to regulate firearm possession in public, requiring a showing that there is an objective threat to a person's safety—a 'special need for self-protection'—before granting a carry license is entirely consistent with the right to bear arms. Indeed, there is no right to engage in self-defense with a firearm until the objective circumstances justify the use of deadly force.").

[52] "[W]e must presume that a jury follows the court's instructions, absent any indication to the contrary." *Daniels v. United States*, 2 A.3d 250, 264 (D.C. 2010) (internal quotation marks omitted).

[53] *See United States v. Greeno*, 679 F.3d 510, 520 (6th Cir. 2012) (stating that "[n]othing in *Heller*, the common law, or early case law suggests" that "the Second Amendment protects an individual's right to possess a weapon for criminal purposes").

that the Second Amendment prohibits the application of the CPWL statute to his conduct on the morning of January 5, 2006.

### 3. Jury Instruction Regarding the Conspiracy Charge

Gilliam and English have argued that the trial court improperly allowed the jury to convict them for conspiracy based solely on acts occurring outside the District of Columbia over which (they contend) the Superior Court lacked jurisdiction. Although we are reversing their conspiracy convictions on another ground, the trial court likely will need to deal with the issue appellants have raised in the event of a retrial. We therefore address the issue briefly.

Under D.C. law, a conspiracy requires proof of both agreement and action: an agreement to commit a criminal offense and, "during the life of the conspiracy, and in furtherance of its objective, the commission by at least one conspirator of at least one of the overt acts specified in the indictment."[54] The indictments in this case charged that appellants entered into an agreement within the District of Columbia to murder Anthony Knight, and that on the morning of January 5, 2006, they committed nine overt acts during and in furtherance of that conspiracy—four

_____

[54] *Gibson v. United States*, 700 A.2d 776, 779 (D.C. 1997).

acts in Maryland (each relating to the Branch Avenue shooting) and five acts in the District (each relating to the shooting on 37th Street).[55]

The problem of which appellants complain materialized for two reasons: First, as the government tacitly conceded, there was no evidence that appellants entered into any conspiracy before they met up on the night of January 4, 2006, at the Tradewinds Club in Maryland.[56]  Rather, as the prosecutor said in her opening, the government's theory at trial was that the conspiracy began when appellants

---

[55]  Specifically, the indictments alleged the following four overt acts in Maryland:  (1) after encountering Knight at a Maryland nightclub, Daniels positioned his car next to a gold Cadillac identical to the one Knight was driving, as it was stopped at a red light on Branch Avenue at Silver Hill Road in Suitland, Maryland; (2) Gilliam, the front seat passenger in Daniels's car, discharged a firearm at the gold Cadillac; (3) English exited Holmes's Tahoe and opened fire on the gold Cadillac as it attempted to escape; and (4) Daniels and Gilliam chased the Cadillac for several blocks on Silver Hill Road.  The indictments charged five overt acts in the District of Columbia:  (5) English and Gilliam thereafter went to English's home at 1730 A Street S.E. to retrieve more weapons while Holmes and Daniels, who were already armed, waited outside; (6) Holmes then drove appellants to 37th Street in his Tahoe to continue looking for Knight; (7) English identified Knight standing in the street in the 400 block of 37th Street, and appellants and Holmes fired handguns at Knight and his companions; (8) Holmes then drove appellants away while appellants reloaded their weapons; and (9) after leaving the scene, appellants and Holmes cleaned out the Tahoe, removing and discarding firearms evidence found in the vehicle.

[56]  For this reason, the trial court ruled that statements made by appellants before they visited the Tradewinds Club on January 4, 2006, would not be admissible under the co-conspirator exception to the rule against hearsay.

arrived at the intersection of Branch Avenue and Silver Hill Road. Nor did the government contend that an agreement was made or renewed thereafter in the District of Columbia. Second, the court instructed the jury on all nine of the charged overt acts—the ones committed in Maryland as well as those committed in the District of Columbia—and stated that proof of *any one of them* would support a conviction for conspiracy.[57] As a result, the jury could have convicted appellants of conspiracy based solely on a finding that they entered into an agreement in Maryland and that they committed an overt act in Maryland—i.e., without finding any conspiratorial agreement made or joined, or overt act committed, within the District of Columbia.[58] Which overt act or acts the jury actually found to have

---

[57] Thus, after enumerating the overt acts, the court instructed that

> The Government need not prove that all of these overt acts were taken. But in order to find the defendants guilty, you must all agree on at least one overt act that was done. . . . For any defendant to be convicted of the crime of conspiracy, the Government must prove . . . that one of the people involved in the conspiracy did one of the overt acts charged.

Appellants did not object to this instruction or request the court to instruct the jury that it would need to find at least one of the overt acts allegedly committed in the District of Columbia.

[58] Although, as mentioned earlier, the court instructed the jury that it had to find that appellants carried pistols in the District of Columbia in connection with Knight's homicide to convict them of CPWL, the court gave no comparable instruction with respect to the conspiracy count; and because simply carrying a

*(continued…)*

been committed is unknown, as the verdict was a general one, but since the jury acquitted appellants of all the offenses on 37th Street, it is plausible that the jury may have relied solely on overt acts in Maryland in convicting appellants of conspiracy.

The criminal conspiracy statute, D.C. Code § 22-1805a, specifically addresses the situation when the alleged conspiratorial agreement was not made in the District of Columbia.[59] Subsection (d) provides that

> [a] conspiracy contrived in another jurisdiction to engage in conduct within the District of Columbia which would constitute a criminal offense under an act of Congress

---

*(continued…)*
pistol in the District was not charged as an overt act in furtherance of the conspiracy, we cannot say that appellants' convictions on the CPWL counts mean the jury *necessarily* found that they committed one of the charged overt acts in the District. The acquittals on the substantive counts may be understood to suggest otherwise.

[59] The statute also addresses the situation, not presented in this case, in which "the object of a conspiracy contrived within the District of Columbia is to engage in conduct in a jurisdiction outside the District of Columbia which would constitute a criminal offense under an act of Congress applicable exclusively to the District of Columbia if performed therein"; such a conspiracy is a violation of the statute if "(1) [s]uch conduct would also constitute a crime under the laws of the other jurisdiction if performed therein; or (2) [s]uch conduct would constitute a criminal offense under an act of Congress exclusively applicable to the District of Columbia even if performed outside the District of Columbia." D.C. Code § 22-1805a (c).

> exclusively applicable to the District of Columbia if performed in the District of Columbia is a violation of this section *when an overt act pursuant to the conspiracy is committed within the District of Columbia*.[60]

We understand this provision to mean that when a prosecution for conspiracy is predicated on an agreement made in another jurisdiction, the government must prove that an overt act pursuant to the conspiracy was committed within the District of Columbia in order to prove the offense. This statutory requirement was overlooked in the present proceedings; the trial court was not asked to instruct the jury in accordance with subsection (d), and it did not do so.

Subsection (d) should be borne in mind if appellants are retried for conspiracy to murder Anthony Knight and the theory of the prosecution remains the same (i.e., that the conspiratorial agreement was "contrived" in Maryland). In that event, to comply with subsection (d) and avoid the possibility of a jury verdict based on an improper theory of liability,[61] the trial court should focus the jury on

---

[60] D.C. Code § 22-1805a (d) (emphasis added).

[61] *See Coghill v. United States*, 982 A.2d 802, 808 (D.C. 2009) ("[W]henever various alternative theories of liability are submitted to a jury, any one of which is later determined to be improper, the conviction cannot be sustained.") (internal quotation marks omitted); *see also Chiarella v. United States*, 445 U.S. 222, 237 n.21 (1980) ("We may not uphold a criminal conviction if it is impossible to ascertain whether the defendant has been punished for noncriminal

*(continued…)*

the five overt acts that allegedly were committed after appellants returned to the District of Columbia. The court should instruct the jury specifically that it must find that one of the conspirators committed at least one of *those five overt acts* in order to find a defendant guilty of conspiracy.

### 4. Remaining Claims of Error

Appellant's remaining claims of error relate to rulings by the trial court with respect to the admission or exclusion of evidence and the denial of a mistrial for alleged prosecutorial misconduct. First, Daniels and Gilliam argue that the court erred in admitting certain out-of-court statements recounted by Holmes—notably, English's statement that, when he ran out of bullets, Daniels and Gilliam were "right there to finish [Knight] off," which the court ruled admissible against them under the co-conspirator exception to the hearsay rule.[62] Appellants contend the

---

*(continued…)*
conduct."); *Yates v. United States*, 354 U.S. 298, 312 (1957) ("[W]e think the proper rule to be applied is that which requires a verdict to be set aside in cases where the verdict is supportable on one ground, but not on another, and it is impossible to tell which ground the jury selected."); *cf. Griffin v. United States*, 502 U.S. 46, 59 (1991) (adhering to rule of *Yates* but not extending it to situations where one possible basis of conviction was neither unconstitutional nor illegal, but merely unsupported by sufficient evidence).

[62] *See Butler v. United States*, 481 A.2d 431, 439 (D.C. 1984).

statement was not made in the course of and in furtherance of the alleged conspiracy, as the hearsay exception requires.[63]

Second, English claims the trial court erred by precluding him from cross-examining Holmes about Knight's alleged assault on Damian Turner. English contends the questioning should have been permitted to explore Holmes's possible motive to falsely implicate him in order to protect Turner from suspicion,[64] and because evidence of the assault would have supported a third-party perpetrator defense.[65]

Lastly, Daniels and Gilliam claim the trial court should have granted their motions for a mistrial after the prosecutor, in her opening statement and closing argument, allegedly made an improper appeal to the emotions and passions of the jury.[66]

---

[63] *See Williams v. United States*, 655 A.2d 310, 313 (D.C. 1995).

[64] *See Hager v. United States*, 791 A.2d 911, 914 (D.C. 2002); *Newman v. United States*, 705 A.2d 246, 251-54 (D.C. 1997); *Jolly v. United States*, 704 A.2d 855, 860 (D.C. 1997).

[65] *See Winfield v. United States*, 676 A.2d 1, 4-5 (D.C. 1996) (en banc).

[66] *See Daniels v. United States*, 2 A.3d 250, 263 (D.C. 2010).

Because we reverse appellants' convictions on a different ground, it is unnecessary for us to reach these claims of error. We consider it inadvisable to do so because the issues appellants raise may not arise at all in any retrial and, if they do, it may be on a materially different factual record that we cannot predict. The legal principles that would guide the trial court if the issues arise in a future trial are well established; only the application of those principles to the particular (as yet unknown) factual context would need to be determined. Consequently, a discussion of appellants' claims now would have little utility.

### III. Conclusion

For the reasons we have explained, we reverse appellants' convictions and remand their cases to the Superior Court for a possible new trial.[67]

*So ordered.*

---

[67] In remanding for a new trial, we express no opinion with respect to whether principles of collateral estoppel will preclude relitigation of issues determined by appellants' acquittals on the murder, assault, and related firearms charges arising out of the 37th Street shootings. *Compare Thomas v. United States*, No. 11-CF-412, 2013 D.C. App. LEXIS 682 (D.C. Oct. 24, 2013), *with Evans v. United States*, 987 A.2d 1138 (D.C. 2010).